that Captain Gapczynski acted outside the standard of a prudent and reasonable mariner in a crisis situation." We agree that the *in extremis* doctrine is relevant to the case before us, but disagree with the district court's conclusion that it excuses the Captain's conduct regarding the port-bow anchor.

Captain Gapczynski was indeed presented with an emergency situation through no fault of the M/V White. The bridge's failure to timely open forced him to make decisions quickly regarding whether the M/V White should try to stop short of the bridge or proceed through the draw, and how he would execute that strategy. His actions are therefore entitled to be viewed under the lenient standard of the *in extremis* doctrine. But once Captain Gapczynski decided to stop short of the bridge, it was unreasonable to delay dropping the port-bow anchor. The M/V White traveled approximately 1,700 feet from the time Captain Gapczynski reversed the ship's engine until the anchor was dropped. At a speed that steadily decreased from six miles per hour, that distance gave the Captain at least four minutes to consider the steps necessary to stop the ship. Dropping the port-bow anchor was one of the most obvious and effective steps that he could have taken to stop the ship short of the bridge. As a result, we conclude that Captain Gapczynski's decision to delay the dropping of the anchor constituted negligence even under the *in extremis* doctrine.

### III. CONCLUSION

For all of the reasons set forth above, we conclude that the district court clearly erred in absolving the M/V White from all responsibility for the collision. We therefore **REVERSE** the judgment of the district court and **REMAND** the case for the apportionment of fault and other proceedings consistent with this opinion.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0307P (6th Cir.)
File Name: 02a0307p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

GROSSE ILE BRIDGE
COMPANY,
        *Plaintiff-Appellant,*

        *v.*                                No. 00-2459

AMERICAN STEAMSHIP
COMPANY,
        *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 92-76556—Denise Page Hood, District Judge.

Argued: August 9, 2002

Decided and Filed: September 9, 2002

Before: KEITH, MOORE, and GILMAN, Circuit Judges.

—————————

### COUNSEL

**ARGUED:** Robert T. Coniam, RAY, ROBINSON, CARLE & DAVIES, Cleveland, Ohio, for Appellant. Thomas W. Emery, GARAN, LUCOW, MILLER, P.C., Detroit, Michigan, for Appellee. **ON BRIEF:** Robert T. Coniam, William D. Carle, III, RAY, ROBINSON, CARLE &

DAVIES, Cleveland, Ohio, for Appellant.   Thomas W. Emery, David M. Shafer, GARAN, LUCOW, MILLER, P.C., Detroit, Michigan, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge.  On September 6, 1992, the M/V H. Lee White, a 700-foot cargo freighter carrying 67 million pounds of iron ore, struck the Grosse Ile Toll Bridge, a pivot-swinging drawbridge on the Trenton Channel of the Detroit River.   The Grosse Ile Bridge Company filed suit against the American Steamship Company, which owns the M/V White, seeking to recover damages to the bridge on the basis that the collision was caused by the M/V White's negligence.  Following a bench trial, the district court found that the M/V White bore no responsibility for the accident, and therefore denied recovery. Grosse Ile now concedes that it was at fault for not timely swinging the bridge open, but argues on appeal that the M/V White was also partly at fault for failing to timely stop when it had the opportunity to do so.   For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

The Grosse Ile Toll Bridge is a privately owned bridge over the Detroit River that opened to traffic in 1913.  It has a swing span in its center section that pivots open.  The swing span is 305 feet long and takes approximately one and a half minutes to completely open after the bridgetender activates the pivot mechanism.  Bracketing the swing section on both sides are fixed spans that are 180 feet in length.  When the swing span is open, two 125-foot "draws" are created on either side of the bridge's pivot point.  The bridge thus presents a tight passage for a ship such as the M/V White, which is 78 feet wide.

or endangering his crew. *Clement v. Metro. W. Side Elevated Ry. Co.*, 123 F. 271, 273 (7th Cir. 1903).

He did not do so because, at the same time that he was trying to stop the ship, he delayed dropping the port-bow anchor in the unrealistic hope that the ship could nevertheless proceed through the draw.   But stopping the ship and proceeding through the draw were mutually exclusive aims, making it unreasonable for Captain Gapczynski to sacrifice the effort to stop the ship in the faint hope of somehow still going through the draw.   From the moment that Captain Gapczinski decided to reverse the ship's engine, he knew that his ship would lose alignment with the bridge's draw, thus making a safe passage impossible.   He was therefore obligated, from that point forward, to maximize the effort to safely stop the ship short of the bridge.  By failing to promptly drop the port-bow anchor, he "contributed to the casualty." *Complaint of American Export Lines, Inc.*, 620 F. Supp. at 500.

### 5.  *Whether the district court erred in applying the* in extremis *doctrine*

The M/V White may nevertheless avoid liability if Captain Gapczynski's delay in dropping the port-bow anchor was reasonable under the lower standard applicable in a crisis situation.  Under the *in extremis* doctrine, the decisions of a captain are to be leniently judged when his or her vessel is put in sudden peril through no fault of its own. *Union Oil Co. of California v. The Tug Mary Malloy*, 414 F.2d 669, 673-74 (5th Cir. 1969) (finding that the defendant tanker's decision to increase its speed to pass the plaintiff vessel did not constitute negligence, particularly in light of the fact that the decision was made in an emergency situation arising from the plaintiff vessel's fault in positioning itself alongside the defendant  in the center of the channel as the two vessels approached a turn that could not be simultaneously negotiated by both of them).   Applying this doctrine, the district court concluded that Grosse Ile "has not been able to demonstrate

factor that contributed to the casualty and it constituted negligence . . .").

Captain Gapczynski had three 13,000-pound anchors available for immediate use: one on either side of the bow, and one on the stern. Grosse Ile does not contest the district court's finding that Captain Gapczynski acted reasonably in not dropping the starboard-bow anchor, because doing so might have endangered the bow tugboat. Given the testimony of Captain Gapczynski and the two tugboat captains that dropping the stern anchor would have endangered the crew of the stern tugboat and possibly entangled the M/V White's propeller, we conclude that the district court's finding of reasonableness in not dropping the stern anchor was also free of error.

Captain Gapczynski's delay in dropping the port-bow anchor until the ship was only 200 to 300 feet from the bridge, however, is another matter. The M/V White does not dispute the bridge's claim that dropping the port-bow anchor earlier would have caused the ship to stop short of the bridge. Yet Captain Gapczynski's only explanation for his delay in dropping the port-bow anchor was that the M/V White "couldn't go through that draw dragging an anchor." That decision was not reasonable, however, because it is completely inconsistent with Captain Gapczynski's strategic decision to stop the ship short of the bridge.

When the M/V White was approximately 2,000 feet from the bridge, Captain Gapczynski reversed the engine, knowing that this action would cause the ship to veer to port and lose alignment with the draw. After the ship lost alignment, it became impracticable for the ship to proceed uninterrupted through the draw, given the nearly perfect angle required to steer a 700-foot long, 78-foot wide ship through a 125-foot opening. Stopping the ship effectively became the "last clear chance" to avoid the collision from that point forward, and it was therefore incumbent upon Captain Gapczynski to do everything he could to stop the ship without hitting the bridge

On September 6, 1992, which was a clear, sunny day, the M/V White was proceeding south on the Trenton Channel of the Detroit River toward its destination beyond the Grosse Ile Toll Bridge. The bridge operators knew that the M/V White was coming, because the ship had radioed notice to the operators the day before. Bridgetenders Donald Ryan and John Tonkovich testified that they expected the ship to arrive shortly after they came on duty at 2:00 p.m. that day.

Ryan was posted in the toll booth with a walkie-talkie. His duties involved taking tolls from passing traffic and lowering the traffic gates to clear the bridge of vehicles whenever the bridge needed to be opened for river traffic. Tonkovich was stationed in the office, which has a window looking northward onto the Trenton Channel. As the bridgetender manning the office, Tonkovich was responsible for monitoring radio communications from the Coast Guard and responding to requests to open the bridge by vessels on the channel. He was also charged with operating the mechanism for opening the bridge, which is situated on top of the office and accessed by ladder.

More than a mile above the bridge, the M/V White picked up two tugboats to help control the ship's lateral movement as it passed through one of the bridge's draws. Richard Sibbersen, captain of the tugboat that attached itself to the M/V White's bow, testified that he informed one of the bridgetenders over the radio that the ship and its tugboats would be at the bridge in the next 10 to 15 minutes. Tonkovich, the bridgetender who received the call, acknowledged the information by saying, according to Captain Sibbersen, that "they would be looking for us."

After the two tugboats began moving down the river at between five and seven miles per hour, Captain Sibbersen again called the bridge by radio. He said: "We're on our way down, we'll be down there in about five minutes or so," to which Tonkovich responded: "Fine. We see you. We'll be ready for you." Captain Sibbersen radioed a second time to

tell the bridgetenders that he would be giving a whistle signal for the bridge to open in just a couple of minutes, and to ask them if they would be ready to open the bridge. Tonkovich replied: "Fine, okay." The whistle signal to open the bridge was given by Captain Sibbersen on his tugboat's whistle just after the M/V White reached Red Buoy 28, the point in the channel where it is customary to give the signal when towing a ship. But the bridge did not respond, so Captain Sibbersen blew a second open-bridge signal on his tugboat's whistle. He also radioed Tonkovich for a third time, but received no reply.

Despite these radio calls and whistle signals, Captain Sibbersen saw vehicular traffic still moving on the toll bridge. So did Richard Gasco, the lookout on the bow of the M/V White, as the ship approached Green Buoy 25 and Red Buoy 26. These buoys, located approximately 2,000 feet above the bridge, are effectively the point of no return for a ship the size of the M/V White. The custom and practice of the bridge was to begin opening the pivotal span for a ship no later than Red Buoy 28, which is 3,000 feet north of Buoys 25 and 26.

Upon reaching the point of no return, Captain Sibbersen blew the danger signal to the bridge on his tugboat's whistle. John Gapczynski, captain of the M/V White, also blew the danger signal, which he repeated as the ship passed the buoys. These danger signals—each one consisting of five short whistle blasts—were heard by witnesses on the shore. In addition to all the whistles, Michael Mehall, a pleasure boater who was next to the bridge and sitting on the top of his boat at the elevation of the bridgetender's office about 12 feet above the water, yelled to Tonkovich that the ship was approaching the bridge. But the bridge remained closed. Allen Wilson, another pleasure boater in the vicinity, testified that the bridge's yellow light, a signal that the bridge is opening, was flashing as the ship's bow passed Green Buoy 25 and Red Buoy 26.

when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern.

*Clement v. Metro. W. Side Elevated Ry. Co.*, 123 F. 271, 273 (7th Cir. 1903) (internal citations omitted).

The district court found that the M/V White had been invited to proceed because the bridge offered assurance in four radio conversations, three of them just minutes before the ship arrived, that it was prepared to open. Furthermore, the bridge specifically acknowledged that it saw the ship approaching, and gave no signal that it would not timely open. We are of the opinion that these exchanges constituted compliance with the Coast Guard regulation relied upon by Grosse Ile. As a result, we have no need to resolve the apparent contradiction between the Coast Guard regulation and the invitation-to-proceed doctrine set forth above. We therefore conclude that (1) the district court's finding that the M/V White had been invited to proceed was not clearly erroneous, and (2) the district court properly found that as a result of having been invited to proceed, the M/V White's progress toward the bridge did not constitute contributory negligence.

### 4. Whether the M/V White was negligent in failing to timely drop its anchors

Grosse Ile next contends that the district court erred in concluding that Captain Gapczynski was not negligent in failing to timely drop the M/V White's stern or port-bow anchors. A ship's captain, in the navigation of his or her vessel, is held to the standard "of such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." *Exxon v. Sofec, Inc.*, 54 F.3d 570, 577 (9th Cir. 1995) (internal quotation marks omitted). Failing to timely drop an anchor can constitute negligence. *Complaint of American Export Lines, Inc.*, 620 F. Supp. 490, 500 (S.D.N.Y. 1985) (holding that the "[f]ailure to release the starboard anchor until the moment of collision was at least a

responsive signal, thus violating this regulation and causing the collision.

But a well-established rule of admiralty law holds that a ship that gives a timely signal to open a bridge is entitled to assume that the bridge will be promptly opened for the ship's passage. The "invitation to proceed" rule has been applied in numerous cases in this and other circuits. *City of Cleveland v. McIver*, 109 F.2d 69, 72 (6th Cir. 1940) (holding that the vessel was not liable for proceeding toward the drawbridge, because the bridge's failure to signal that it was unable to open constituted an invitation to proceed); *Liability in Admiralty for Collision between Vessel and Drawbridge Structure*,134 A.L.R. Fed. 537, 551-52 (1996) ("Because the right of vessels to use navigable waters is paramount, a vessel that signals properly for passage through a drawbridge has a right to assume the bridge will timely be opened for it, and to approach the bridge on that basis."); *cf. Michigan Bell Tel. Co. v. Copper Range R.R. Co.*, 355 F.2d 678, 683 (6th Cir. 1966) (holding the defendant vessel had not been invited to proceed, and was therefore partly liable for the collision, because it approached the bridge without prior communication, and the bridge's warning lights were visible as signals that the bridge was unable to open).

An often-quoted statement of the invitation-to-proceed rule is that

[a] vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding, but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened,

But neither the M/V White nor the tugboats saw the light or any other sign that the bridge was about to open, and the district court made no finding as to whether the yellow light was in fact on or off. Gasco, the lookout, testified that he was aware that a flashing yellow light is one method that a bridge can use to signal that it is about to open, but said that he did not specifically look for such a light on the day of the accident because it would have been difficult to see in sunny conditions. Instead, he focused on other signs that the bridge was opening, such as the traffic on the bridge.

Soon after the ship passed the point of no return, Gasco saw a car hurriedly back away from the center section of the bridge. Interpreting this as a sign that the bridge was about to open, Gasco told Captain Gapczynski that the vehicular traffic had finally cleared away. But then Gasco saw two more vehicles drive onto the center section. Hearing this, Captain Gapczynski decided that he had to stop the M/V White in order to avoid a collision. In attempting to do so, Captain Gapczynski first radioed to the tugboats that he was going to back down the M/V White's engine, even though this would cause the bow of the freighter to swing to the port side. He told Captain Sibbersen to move his tugboat from the bow to the starboard flank of the ship in order to partially counteract the movement to port. The M/V White's engine was then put into reverse, causing the bow to veer to port and thus lose alignment with the planned draw through the open bridge.

Sometime after these measures were taken, the bridge finally began to open. When the M/V White was just 200 to 300 feet from the bridge, the ship dropped its 13,000-pound port-bow anchor. The M/V White had come to an almost complete stop when it reached the bridge, but its bow tapped the stationary span on the east side of the bridge. Because of the huge momentum of a ship laden with 67 million pounds of iron ore, this slight tap was enough to knock the entire 180-foot span into the water. Fortunately, no one was injured. The bridge, as it turned out, had fully opened by the time the ship hit the stationary span.

Why the bridge failed to timely open is less than clear. Tonkovich testified that he simply thought he had more time to open the bridge than he did, and that he did not hear the ship's second danger signal. Ryan offered no justification. There was testimony from one of the off-duty bridgetenders, however, that Ryan appeared to have been drinking alcohol when he reported for duty at 2:00 p.m. on the date of the accident.

Grosse Ile sued American Steamship to recover damages to the bridge. After a seven-week bench trial, the district court found that the bridgetenders had failed to timely open the bridge for the M/V White despite receiving multiple notices of the ship's approach. The district court concluded that Grosse Ile's "actions and lack of action in this matter caused the [co]llision," and that the M/V White bore no responsibility for the accident. Grosse Ile then filed this timely appeal.

## II. ANALYSIS

### A. Standard of review

The district court's apportionment of fault is subject to review under the clearly erroneous standard. *In re Cleveland Tankers, Inc.*, 67 F.3d 1200, 1205 (6th Cir. 1995) (affirming the district court's apportionment of fault in an admiralty case using the clearly erroneous standard); *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 405 (5th Cir. 1982) (holding that, in an admiralty case, "questions concerning . . . the existence of negligence and proximate causation are treated as factual issues and are thus subject to the clearly erroneous standard"). A finding "is clearly erroneous where, although there is evidence to support that finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Kalamazoo River Study Group v. Rockwell Intern. Corp.*, 274 F.3d 1043, 1047 (6th Cir. 2002) (internal quotation marks omitted).

opening on time. Furthermore, we are not in a position to second-guess the district court's first-hand corroboration of Gasco's statement about the low visibility of the yellow flashing light in the daytime. Gasco's decision to focus on the more easily observed signs of activity on the bridge rather than search for a flashing yellow light was therefore a judgment call that a vigilant, competent lookout could reasonably have made under the circumstances. We therefore conclude that the district court did not err in finding Gasco to have been a proper lookout.

In addition, even if Gasco's failure to look for the flashing yellow light had rendered him an improper lookout, the M/V White could meet its burden to rebut the presumption of fault under the rule of *The Pennsylvania*. This is because Gasco observed cars entering the swing span after the M/V White had passed the point of no return. Assuming that the yellow light was in fact flashing at that time, and that Gasco had seen it, the fact that cars were still driving across the bridge would have led the M/V White to reasonably believe that the yellow light was giving false information. The failure to see the yellow light therefore could not have been a cause of the collision, because Captain Gapczynski's decision to stop short of the bridge would not have changed.

### 3. Whether the M/V White was at fault in proceeding toward the bridge

Grosse Ile further argues that the district court erred in not attributing fault to the M/V White based on its violation of the following Coast Guard regulation:

[T]he operator of each vessel requesting a drawbridge to open shall signal the drawtender and the drawtender shall acknowledge that signal. The signal shall be repeated until acknowledged in some manner by the drawtender before proceeding.

33 C.F.R. § 117.15(a)(1). Grosse Ile contends that the M/V White proceeded toward the bridge in the absence of a

But Grosse Ile argues that Gasco was nevertheless an improper lookout because he "did not know the response signal for which he should be looking." According to Grosse Ile, Gasco should have been looking for the bridge's flashing yellow light, which is one of the methods that the Coast Guard has approved for a drawbridge to signal that it is preparing to open. 33 C.F.R. § 117.15(c)(2)(iii).

Gasco testified, contrary to Grosse Ile's characterization of his statements, that he was aware that a flashing yellow light may be used by a bridge to signal that it is opening, and that if he had seen such a light, he would have reported it. But Gasco explained that he does not specifically look for flashing yellow lights during the daylight hours because they are too difficult to see at such times. Rather, he looks for other signs that a bridge is preparing to open, such as the lowering of the gates that prevent vehicles from entering the swing span and the cessation of traffic flow across the bridge. The question therefore becomes whether Gasco's decision not to look specifically for the yellow light rendered him an improper lookout.

During the course of the trial, the district judge personally viewed the opening of the pivotal span from the pilothouse of a ship similar to the M/V White as it approached the Grosse Ile Toll Bridge. The judge found that

> on a clear, sunny day not unlike the day of the [co]llision, . . . the yellow signal light while visible is not very visible to the naked eye during sunny daylight hours. However, the activity on the bridge is very visible from the pilothouse of the vessel and by inference would be more visible from the bow which is approximately 600 feet forward of the pilothouse.

There is no dispute that Gasco competently observed and accurately reported the actions of the gates and traffic on the bridge, as well as the nonopening status of the bridge itself, and that all of these indicators pointed to the bridge not

## B.   The district court's findings

### 1.   *Whether bridgetender Ryan had been drinking alcohol*

Grosse Ile contends that the district court erred in finding that bridgetender Ryan had been drinking on the day of the accident, and that this finding "is extremely important, because it may explain otherwise unexplainable conclusions the Court reached about the actions of the vessel, and may have otherwise tainted her opinion." The following passage in the district court's opinion discusses Ryan's alleged drinking:

> Ryan was said to have received alcoholic beverages as gifts while tending the bridge. Gerald Lakos, an off duty bridgetender, also testified that Ryan had been drinking that day. These facts do not indicate that the bridgetenders were not generally competent to operate the bridge. The Court finds that the bridgetenders were generally competent to operate the bridge. However, on September 6, 1992, neither bridgetender exhibited this general competence in opening the bridge.

Although the district court's opinion refers to Lakos's testimony in the above passage, it is not clear that the district court found as a matter of fact that Ryan had been drinking on the day of the accident. Even if the district court is presumed to have made such a finding, however, we conclude that the finding was sufficiently supported by the record as not to be clearly erroneous. Lakos's testimony had several indicia of credibility. First, Lakos knew Ryan personally and was thus likely to be able to detect changes in his demeanor. Second, Lakos was one of the bridgetenders on the shift that ended just before Ryan came on duty at 2:00 p.m. on the day of the accident. Finally, Lakos testified that when he saw and spoke to Ryan at the shift change, Ryan appeared to have been drinking because his speech was slurred and he had a brown paper bag with him. Lakos therefore saw Ryan first hand, and

made specific observations very near in time to the 2:15 p.m. collision.

On the other hand, it was common for bridgetenders to receive gifts of alcohol without opening the gifts, and Ryan's slurred speech could have resulted from chewing gum. This contrary evidence is not so overwhelming, however, as to leave us with a definite and firm conviction that a finding that Ryan had been drinking when he reported for duty on the date of the accident would be clearly erroneous.

Furthermore, the conclusion that the district court allegedly drew from the fact that Ryan had been drinking—that he exhibited incompetence in timely opening the bridge on the day of the accident—is fully supported by other uncontested facts in the record. This is made clear in the portion of the district court's opinion that immediately follows the passage quoted above:

> Instead, the bridgetenders delayed the opening of the bridge, continued to allow vehicles onto the bridge and failed to respond to the vessel after the danger signals were given. The Court finds that on September 6, 1992, the Grosse Ile bridge was tended by competent and well-trained bridgetenders. However, these bridgetenders failed to competently perform their duties on the date in question.

The matter of whether Ryan had been drinking is thus superfluous to the district court's ultimate finding that the Grosse Ile bridgetenders failed to competently perform their duties that day.

### 2.   *Whether the M/V White posted a proper lookout*

Grosse Ile also contends that the district court erred in determining that the M/V White posted a proper lookout. By statute,

> [e]very vessel shall at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

33 U.S.C § 2005. A lookout must be a person of suitable experience and vigilance, stationed at a place where the risk of the danger of collision may be readily perceived. *See Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 800 (5th Cir. 1977) (finding that the defendant vessel had failed to post a proper lookout because, although well-positioned on the bow and apparently capable of observing the important signs of danger, the lookouts were not adequately vigilant in executing their duties prior to the collision between the vessel and a wharf).

If the M/V White failed to post a proper lookout in violation of this statute, then the rule of *The Pennsylvania,* 86 U.S. 125 (1873), would govern the issue of liability. The Supreme Court held in *The Pennsylvania* that where a vessel at the time of a collision is in violation of a statutory or regulatory rule intended to prevent such a collision, the violation is presumed to be at least a contributory cause of the accident. *Id.* at 136. To rebut this presumption, the vessel in violation of a rule must prove not only that the violation was not in fact the cause of the accident, but that the violation *could not* have been a cause of the accident. *Id.*

In the present case, the lookout on the M/V White as it approached the Grosse Ile Toll Bridge was Richard Gasco, the ship's second mate. Gasco was positioned on the bow, from which he communicated directly with Captain Gapczynski via radio. A licensed pilot, Gasco had gone through the Grosse Ile Toll Bridge numerous times during his 13 years as a seaman. Gasco was therefore well-credentialed to serve as the M/V White's lookout, and he was positioned properly to view the bridge as the ship drew near.