CITY OF CHICAGO, an Illinois municipal corporation, Plaintiff,

v.

M/V MORGAN, its engines, boilers, tackle, apparel, furniture, and appurtenances, in rem, Kindra Lake Towing, L.P., an Illinois limited partnership, in personam, and Kindra Lake Towing, Inc., a general partner, in personam, Defendants.

No. 00 C 46.

United States District Court, N.D. Illinois, Eastern Division.

Feb. 26, 2003.

John H. Ehrlich, Esq., Melissa L. Whelan, Esq., City of Chicago, Law Department, Corporation Counsel, Chicago, IL, for Plaintiff.

Daniel Thomas Crowe, Esq., James A. Santucci, Esq., Chilton, Yambert, Porter & Coghlan, Chicago, IL, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KING, District Judge, Sitting by Designation.

## I. INTRODUCTION

On April 17, 1998, a barge being pushed by the tugboat *M/V Morgan* allided with

the East 95th Street Bridge, which crosses over the Calumet River south of Chicago. The allision damaged eight of ten cables used to transmit power to the bridge and its various needs. The Plaintiff City of Chicago ("Plaintiff" or "City") brought this suit to recover some $625,000 it spent in repairing or replacing the cables.

The Court conducted a non-jury trial of this action on August 8 and 9, 2002. After the close of the trial, the Court took the matter under advisement and, after a period for preparation of trial transcripts, the parties submitted proposed Findings of Fact and Conclusions of Law in November and December of 2002.

The Court has carefully reviewed the evidence and arguments, and has conducted further research as necessary. Pursuant to Fed.R.Civ.P. 52(a), the following constitute the Court's Findings of Fact ("Findings") and Conclusions of Law ("Conclusions"). To the extent any Findings as stated may also be deemed to be Conclusions, they shall also be considered Conclusions. Similarly, to the extent any Conclusions as stated may be deemed to be Findings, they shall be considered Findings. *See In re Lemmons & Company, Inc.,* 742 F.2d 1064, 1070 (7th Cir.1984) ("The labels of fact and law assigned by the trial court are not controlling"); *Benrose Fabrics Corp. v. Rosenstein,* 183 F.2d 355, 357 (7th Cir.1950) (labeling of a finding as one of law as opposed to fact is not determinative of its true nature).

1. The Court uses the following designations: APTO___ for the Amended Pre–Trial Order and SAPTO___ for the Supplemental Amended Pre–Trial Order; the blank refers to the relevant paragraph. The City also uses these designations: PX___ for the Plaintiff's Exhibits and DX___ for the Defendants' Exhibits;

## II. FINDINGS OF FACT

### A. THE EAST 95TH STREET BRIDGE

1. The East 95th Street in the City of Chicago crosses the Calumet River over a double-leaf trunnion, iron-bascule bridge. APTO3; PX5; T23.[1]

2. The Calumet River is a navigable waterway. APTO2; PX19.

3. The East 95th Street bridge is held in trust by the City of Chicago for the benefit of the public. APTO4.

4. The City of Chicago has maintenance responsibility for the East 95th Street bridge. T22, 24, 251.

5. Masonry walls form the east and west piers of the bridge, which support it and contain the machine houses. The masonry walls are 206 feet apart. APTO6; PX5; PX6.

6. The clear channel under the draw of the East 95th Street bridge is 200 feet because the lattice work of the bridge's superstructure comes down near the piers. PX13; T30; T106.

7. The maximum navigable channel under the East 95th Street bridge is 204 feet. APTO100.

8. All City bascule bridges use submarine cables. The cables transmit power for bridge motors, gates, bells, and other controls from the bridge tower to the far side of the bridge. T31.

9. The East 95th Street bridge is operated from the bridge tower located on the northeast corner of the bridge. APTO7; PX5; PX6.

the blank refers to the relevant exhibit number. (As to the deposition of Robert Bloom, PX20, the parties had stipulated to this exhibit before trial and the court admitted the deposition into evidence.) The designation T___ refers to the trial transcript; the blank refers to the relevant page.

10. The bridge is opened and closed through the use of ten submarine electrical cables. The cables run from the bridge tower down a cable slot recessed in the face of the bridge's east pier. APTO8; PX5; T31–32.

11. The submarine cables were originally laid on the Calumet River bottom and may have been covered with mud or became covered with mud silt over time. APTO9; PX2; T31–32.

12. The Calumet River bed is 25 feet below the water line. PX6; T219.

13. Eight of the ten cables leave the channel bottom within two feet of the western pier face, while the remaining two cables leave the channel bottom four feet from the western pier face. PX3; T219–20.

14. The cables run up the bridge's western pier face in another recessed cable slot. The cables then enter the machine house controlling the bridge's western leaf. APTO10; PX5; PX6; T31–32.

15. The navigable channel beneath the East 95th Street bridge does not include the slot that is recessed into the western pier in which the cables run. APTO101; PX20 at 57–58.

16. The submarine cables in the cable slot on the western pier of the East 95th Street bridge are outside of the navigable channel. PX20 at 57–58; T272.

## B. THE CITY OF CHICAGO'S PROTECTION SYSTEMS

17. It is fairly common for barges and vessels to touch or rub—and in that sense "allide" with—the substructures of bridges. APTO28.

18. When a vessel allides with a bridge in the City of Chicago the damage to the bridge is most often to the superstructure. T30–31.

19. It is more common for a vessel to allide with a bridge through rubbing rather than striking at an acute angle. T213.

20. There was no evidence presented of any specific allision with the East 95th Street bridge before April 17, 1998. T217; T270. There was, however, some indication that vessels had rubbed against parts of the bridge in the past. T228.

21. A dolphin is a pile cluster placed in the waterway just outside of the draw of a bridge. A dolphin protects the bridge piers and the lower portions of the bridge superstructure. T25; T29–31.

22. There are two timber-pile, steel-clad dolphins located just south of the draw of the East 95th Street bridge, one adjacent to each of the piers. PX6; PX9.

23. Dolphins are the most important structures for protecting the East 95th Street bridge because they protect those areas of the bridge that are most subject to damage by an allision. T29–31; T34.

24. The City protected the submarine cables on the East 95th Street bridge from damage by placing them in a slot recessed into the face of the pier and, for other lengths of the cables, by burying them under the Calumet River bottom. T31–32. Nevertheless, without more, the cables on the face of the pier were somewhat exposed to the river and thus exposed to possible allisions at certain angles. E.g. DX9, Photo. 5; DX13 at P4, EP3–EP7.

25. A fender is typically a wooden rub rail that runs along the face of a substructure of a bridge. APTO17. Fenders are also known as rub rails or timber walers. APTO18; PX20 at 14; T240.

26. A fender is designed to provide a non-sparking and non-tearing surface that will share an impact between a vessel and a bridge. APTO89; PX20 at 18.

27. Fenders primarily serve to protect vessels that come into contact with the bridge piers. T34; T46. In the design of the East 95th Street bridge, however, fenders also provided a horizontal cover over the perpendicular recessed slot in which the ten electrical cables were placed. In this sense, the fenders had some function in covering the slot and thus protecting the electrical cables. *See, e.g.,* DX9, Photo. 5; DX13 at P4, EP3–EP7.

28. Documents in the United States Coast Guard file relative to the East 95th Street bridge depict a fender system on the west pier of the East 95th Street bridge. TR248. For example, a document contained in the United States Coast Guard file entitled "Sketch Showing Clearance of the 95th Street Bridge Over Calumet River," dated December 19, 1958, indicates fenders or timber walers on the west pier covering the cable slot where the submarine cables are located. APTO22.

29. The fender or timber walers on the face of the concrete river piers have existed as a part of the present East 95th Street bridge since it was constructed and opened to vehicular traffic in 1958. DX2, 14, 15, 16, 27; APTO23.

30. By at least 1994 a fender or timber waler covering the cable slot in the west river wall of the East 95th Street bridge had deteriorated and was missing. DX 8, 9, 10; R44, 45.

31. The City retains outside consultants to conduct the required biennial inspections of the 350 bridges located in the City. T36–37.

32. Several previous inspection reports indicated that a fender or fenders were missing over the cable slot on the western pier of the East 95th Street bridge before the April 17, 1998 allision. DX 8, 9, 10; T44–45. For example, a December 1994 report prepared for the City of Chicago by Collins Engineering stated that "On the West River Pier at the north end, the two timber rub rails/fenders had been damaged by impact for a length of approximately 15 feet. the timbers were essentially crushed, and had up to 50 percent loss of section." DX9, at 4. Similarly, a "1997/1998 Structural Bridge Inspection Project" report by T.Y. Lin International BASCOR Inc., based upon an inspection of July 21, 1997, indicated "The timber rail on the west seawall has collision damage." DX10, at 8.

33. Not all of the reports recommended replacing the missing fender or fenders, and the reports generally characterized the condition of the existing fenders as good to fair. DX8; T23–24; T43–45; T57–58. A December 1994 report recommended replacing the timber fenders. DX9, at 5.

34. If a consultant's inspection report pointed out a bridge deficiency, the City acted on the recommendation depending on the severity of the deficiency. T38.

35. Stan Kaderbek is Deputy Commissioner–Chief Engineer of the City of Chicago Department of Transportation, Bureau of Bridges. Kaderbek admitted that the City had notice that the fenders or timber walers across the cable slot had been missing from the west pier of the East 95th Street bridge since at least December 1994. APTO26, T23,43.

36. According to Kaderbek, replacement of the fenders or timber walers was not a priority. The focus was on dolphins as a method of protection of bridge superstructures. T29–30, 38.

37. Without a fender or timber waler, the cables were exposed to the river. The cables, however, were protected from sideways, i.e., parallel, contact by being placed in a slot. It was nevertheless reasonably foreseeable that the cables could be damaged by a minor allision in the form of the

fairly common "rubbing" or "touching." DX 8, 9, 10; R44, 45.

## C. THE UNITED STATES COAST GUARD PERMIT FOR THE EAST 95TH STREET BRIDGE

38. Bridges that cross navigable rivers in the United States come under the authority of the United States Coast Guard. APTO11; PX20 at 6–7. Before 1967, bridges that crossed navigable rivers in the United States came under the authority of the United States Army Corps of Engineers. APTO12; PX20 at 24–25.

39. The purpose of the United States Coast Guard authority over bridges is to make sure that they do not impede navigation. APTO13; PX20 at 8.

40. A bridge permit represents the end result of a process that starts with an application to the Coast Guard for construction of a bridge across a United States waterway. APTO15; PX20 at 10.

41. A bridge permit is a one- or two-page document to which is attached a set of 8½-by-11-inch plan and elevation views with a Coast Guard stamp affixed to each page. PX20 at 10–11.

42. Drawings that are typically submitted to the Coast Guard during the permit process are type and size drawings, which are general configuration drawings of the bridge. T58–59.

43. During the bridge permit process, the type of navigation utilizing a waterway will be reviewed and a determination will be made on a case-by-case basis whether a bridge protection system in the form of fenders will be required. PX20 at 19.

44. There is no regulation or United States Coast Guard rule that categorically requires a bridge owner to install a rub rail or fender. T27–28.

45. When the United States Coast Guard took over the bridge permitting program in 1967, the Army Corps of Engineers transferred all bridge files to the Coast Guard. PX20 at 25.

46. The Coast Guard keeps a bridge file for the East 95th Street bridge containing all permit documents and Coast Guard correspondence regarding the bridge. PX20 at 10–11.

48. The Army Corps of Engineers issued a permit for construction of the East 95th Street bridge in 1952–53. APTO90; PX20 at 23.

49. The 1952–53 permit for the East 95th Street bridge does not depict a fender on the western pier of the East 95th Street bridge. APTO90; PX20 at 23.

50. There are no permit documents in the United States Coast Guard file indicating that rub wales or fenders are required on the East 95th Street Bridge. PX20 at 18; PX20 at 47–48; DX23.

51. The correspondence and other documents in the Coast Guard file indicating that the Coast Guard knew that the East 95th Street bridge had wales or fenders on its piers, does not necessarily mean that the Coast Guard had issued a permit allowing or requiring fenders or wales on the piers. Such correspondence and documents merely suggest that the Coast Guard recognized that the bridge, with its fenders or wales, was a legal structure. PX20 at 35; PX20 at 47–50.

52. City of Chicago files contain drawings dated as early as 1953 that depict fenders or rub rails on the piers of the East 95th Street bridge, but there is no evidence that the Army Corps of Engineers or the United States Coast Guard ever reviewed these drawings. T273–74.

53. City of Chicago files contain some other drawings of the East 95th Street bridge from that same time period that do not depict fenders on the piers. DX23; T271.

54. The United States Coast Guard has never issued a permit violation to the City of Chicago for missing timber fenders on the East 95th Street bridge. APTO97; PX20 at 50–51.

### D. THE PRELIMINARY ACTIVITIES OF THE *MORGAN* AND ITS CREW ON APRIL 17, 1998

55. The *Morgan* is a 134–ton tugboat owned by Kindra Lake Towing, L.P. APTO1; T184.

56. James Long was the captain of the *Morgan* on April 17, 1998. Brian Grzybowski was the deck engineer, and John Kindra and Ryan Campbell were the deck hands. PX14; T97; T119–20.

57. Long had been working for Kindra Lake Towing for only 2 ½ months before April 17, 1998. T121.

58. Kindra did not normally work on the *Morgan* or any other vessel. Rather, he worked in the office as a manager. T119–20.

59. Campbell did not normally work on the *Morgan*. Rather, he worked in the office doing personnel management. T120.

60. The *Morgan*'s starboard and port decks each contained a winch. T89.

61. Each winch was approximately four feet high and was bolted to the *Morgan*'s deck. APTO41.

62. Grzybowski did not inspect the winches on the *Morgan*'s deck on April 17, 1998. APTO30.

63. The winches on the *Morgan*'s deck were inspected weekly, but Grzybowski did not know on what day of the week the crew inspected the *Morgan*'s winches, when they were last inspected, or who had last inspected them before April 17, 1998. APTO31–32.

64. Long did not physically inspect the winches or their brake shoes on April 17, 1998 or any other day because that was not part of his routine. Someone else checked the winches and the brake shoes. T118–19.

65. On the morning of April 17, 1998, prior to the allision with the East 95th Street bridge, the *Morgan* moved a barge at the Kindra Lake Towing dock located on the east bank of the Calumet River at approximately East 98th Street in the City of Chicago. APTO33; T95–96.

66. The starboard winch functioned properly when the *Morgan* moved the barge on the Kindra Lake Towing dock. APTO34; T96.

### E. THE *MORGAN*'S ARRIVAL AT FEDERAL MARINE DOCK

67. The *Morgan* had been chartered to move four barges north on the Calumet River from the Federal Marine Terminal to the Ceres Trans–Oceanic Service Terminal. APTO35; PX14; T121.

68. The Federal Marine Terminal is located on the east bank of the Calumet River immediately south of the East 95th Street bridge. The Ceres Terminal is located near the mouth of the Calumet River near Lake Michigan. APTO36; DX30; T96–97.

69. The barges were tied two long and two abreast to the Federal Marine dock. APTO39; PX14; T99.

70. The barges contained coke, and the combined weight of the *Morgan*, the barges, and the coke was approximately 5,000 tons. T121–22.

### F. THE CAPTAIN AND THE CREW'S PREPARATION FOR LEAVING THE FEDERAL MARINE DOCK

71. The crew began to face up the *Morgan* with the south end of the barges by extending a single one-and-one-eighth-inch loop wire from each of the starboard and port winches located on the *Morgan*'s

deck to the furthest outboard cleat on the respective aft starboard and port barges. APTO40; T123.

72. Facing up created three points of connection between the *Morgan* and the barge cluster: (1) the contact between the nose of the *Morgan* and the rear end of the barges; (2) a wire line connection running from the starboard winch to the rear-most starboard cleat on the barge cluster; and (3) a wire line running from the port winch to the rear-most port cleat on the barge cluster. T69.

73. The winches put tension on the lines while the winch brakes maintain the tension on the line when the motor is not powered. T70.

74. By facing up the *Morgan* with the barges, the *Morgan* and the barge cluster turned into a single rigid body. T68; T122–23.

75. A three-point connection was important to permit the *Morgan* to steer the barge cluster. If one of the side connections were lost, the ability to steer in that direction would be lost. T70–71.

76. Two buttons controlled each winch, a green one to draw in the wire, and a red one to release the wire. Releasing the button braked the wire automatically and held it in place. APTO42; T90.

77. Once the starboard and port wires had been cast, Long tightened them by using the buttons on the electric control box located in the pilot house. APTO43.

78. Long did not encounter any problems in drawing in the wires, and the *Morgan* and the barges faced up. APTO44.

## G. LEAVING THE FEDERAL MARINE DOCK

79. To leave the Federal Marine dock, Long first kicked the head of the tow (i.e., turned the barges starboard). T103–05;

T123. This put strain or tension on the starboard wire. T124–25.

80. Long then backed on the outboard engine and began to back out. As he was swinging the tow into the center of the river, he noticed that the *Morgan* was getting close to the dock, so he gave the tug more room by putting a foot or two of slack in the starboard wire. T103–05; T123–25.

81. Long put slack in the starboard wire by hitting the button in the pilot house that controlled the starboard winch. T104.

82. Once Long knew that the tug would not touch the dock, he tightened up the starboard wire by using the button on the control panel to face up the *Morgan* with the barges. When Long released the control button for the starboard winch, the brakes failed to hold the wire and it began to pay out. T104–06; T127.

## H. THE CAPTAIN AND CREW'S RESPONSE TO THE FAILURE OF THE BRAKE ON THE STARBOARD WINCH

83. When the winch failed to brake the starboard wire, the barges began to fall to port. APTO49.

84. When the brake on the starboard winch failed, the starboard line lost tension and the *Morgan* lost the ability to turn the barge cluster to starboard. T71.

85. Long has no explanation why the brake shoes on the starboard winch failed. T126.

86. On all other occasions the day before this one, the starboard winch had worked properly. T134. At no relevant time did Long think there was a problem with the starboard winch's engine. T134.

87. Long contacted Grzybowski over a portable VHF radio and told him that the starboard winch was paying out and to

send someone back to the *Morgan*'s deck. APTO50; T105–06.

88. At about the same time, Long radioed the East 95th Street bridge tender to open the bridge so that the *Morgan*'s coaming would not hit the underside of the bridge. APTO53; T106–07; T135. (At some point, the *Morgan* and the barges were moving towards the East 95th Street Bridge.)

89. Grzybowski was standing at the port bow corner of the foremost barge. After receiving Long's transmission, Grzybowski told Kindra to go back to the deck of the *Morgan*. APTO51.

90. The foremost barge was approximately 100 feet south of the East 95th Street bridge and favoring port when Grzybowski received Long's radio message. APTO52.

91. Grzybowski was in contact with Long by radio. At some point, Grzybowski began a countdown by feet when the port bow corner of the foremost barge was 100 feet from the bridge. APTO59; T158.

92. Long could not remember hearing Grzybowski give a countdown, so Long did not know how many feet the barges were from the East 95th Street bridge pier. APTO60; T136–37.

93. Long also does not remember hearing Grzybowski give a warning that the barges were about to allide with the bridge. T137.

94. After Long contacted Grzybowski by the VHF radio, he put the engines in reverse. T105–06. Putting the engines in reverse slowed the tug and the tow, but the tug and tow continued to move forward because of the momentum they had from leaving the Federal Marine dock. T128; APTO54. By Long's estimate, the barges and tug (or cargo) weighed about 5000 tons. T122.

95. Kindra was at the front of the barge cluster and had to walk the length of

the barges—400 feet—and then cross over to the *Morgan* before he could assist Long. T171–72.

96. During the time that Kindra was making his way back to the *Morgan*, the starboard line was still paying out. T183.

97. Kindra could not get to the *Morgan*'s deck from the starboard side because the starboard winch was paying out; therefore, the starboard tow knee was not up. T172.

98. Kindra got to the *Morgan*'s deck by crossing from the port side and then walking over to the starboard winch. According to Kindra, only then did Long begin drawing in the starboard wire and facing up the barges. T173, 184.

99. Long directed Kindra to put a fiber line out from the bitt located in the center of the *Morgan*'s deck to the center of the rear of the tow. Casting the center line by itself did not face up the *Morgan* with the barges. T131–32.

100. Long then brought in the starboard wire and told Kindra to put a dog in the starboard winch to brake the wire; Kindra recalls dogging the winch first, i.e., before the center capstan line was attached. APTO 55; T173. Kindra also recalls dogging the winch before Long brought in the starboard wire. T183. "Dogging the winch" prevents the cable from unwinding. T174–75.

101. Only after the line had been brought in by plugging the switch to bring in the starboard wire and dogging the winch did the *Morgan* and the barges line up one hundred percent. T133. After the winch was dogged, which acted as a brake, the line could be drawn in without it again panning out.

102. The barges, once again, faced up with the *Morgan*, but they were still canted to port. APTO56.

103. By the time the center line had been set and the starboard wire secured with a dog in the winch, the lead barge was going through the draw of the East 95th Street bridge. APTO57.

104. One way to have restored the tension to the starboard line earlier would have been to draw in the starboard line using the motor on the winch. T71–72. That is, even if the brake in the winch did not hold, the line could have been drawn in periodically.

105. If Long had used the motor on the starboard winch to draw in the starboard line, he might have been able to maintain tension on the line by intermittently punching the control button for the winch. T72.

106. Long recalls punching the control button for the winch about three times. T138. He also described his actions in this regard as "continually" or "intermittently" hitting it to get it to come in. T107; T128. The button on the winch is an electrical connection; therefore, once the button is pushed, the motor should almost instantaneously begin to draw in the wire. T72. On the other hand, continually holding down the winch button could blow the breaker. T107.

107. Once the barges had faced up, Long backed on the starboard engine, put the flanking rudder over, and then drove the tug and tow into the center of the river. APTO58; T110.

**I. THE ALLISION**

108. The port bow corner of the foremost barge allided with the bridge timber waler on the western pier approximately at the center of the draw. APTO61.

109. The barge was moving at about one mile per hour just prior to the contact. T108. It was "creeping" along the timber walers. T152. That is, the forward speed of the Morgan and the tow was down close

to nothing immediately before the allision. APTO64.

110. The barge slid down the timber walers and bounced off a little bit. Grzybowski saw the port bow corner of the foremost barge slide into the cable slot where the timber waler was missing. APTO63; T159–60. The barge slid off the existing timber waler and slid in and past the cables. T153. Several cables were pinched.

111. If the timber waler had been in place across the cable slot, the port bow corner of the barge would have slid along the timber waler and probably would not have contacted the cables. T153–155; DX 27.

112. The barge slid down the timber walers without causing any visible damage to the existing timber walers or the bow structure of the barge. Nor was there any visible damage to the concrete structure of the bridge. T154.

113. The allision was such that Long and Kindra were not aware until later that the barge had hit anything. T110–112, 176.

**J. CITY'S IMMEDIATE POST–ALLISION ACTS**

114. According to the Bridge Operator's Swing Report for the East 95th Street bridge, the Morgan navigated under the East 95th Street bridge at 9:10 a.m. on April 17, 1998. PX8.

115. Following the allision, the bridge operator George Sledge informed his supervisor that the East 95th Street bridge was no longer functioning. APTO67.

116. The Emergency Bridge Report, also completed by Sledge, indicates that the Morgan allided with the East 95th Street bridge at 9:10 a.m. on April 17, 1998. At the time of the allision, the bridge's leaves were in the up position and

the roadway gates were down. Sledge wrote in his report: "Morgan hit the sea wall geoing [sic] north with 4 barges on the west side of the bridge." PX7.

117. The Swing Report indicates that no further bridge openings occurred on April 17 after the *Morgan*'s allision. PX8.

118. The allision damage to the cables cut the power for the bridge's motors and brakes, making it impossible to open or close the bridge's west leaf. T32–34.

119. Later on April 17, 1998, electricians from the City of Chicago Department of Transportation, Bureau of Bridges, temporarily rerouted power from the damaged submarine cables to others so that the western leaf of the bridge could be opened and closed. APTO68.

120. Even after these temporary repairs to the cables, the gates and safety devices (including bells) for the East 95th Street bridge did not work. APTO69; T32–34.

121. The warning lights on the superstructure did not work for 1 ½ years following the allision. T56.

122. The City reopened the East 95th Street bridge for vessel traffic on April 18, 1998. APTO70; PX8.

123. The City is unaware of any allisions with the East 95th Street bridge after the April 17, 1998 allision and before the submarine cable repairs. T34.

### K. CONSULTANTS' POST–ALLISION BRIDGE REPORTS

124. The City retained T.Y.Lin International Bascor to inspect the damage to the East 95th Street bridge. T.Y.Lin retained its own consultant, Lang & Associates, to inspect the bridge, and Lang conducted its inspection on April 29, 1998. PX4.

125. Lang's inspection revealed minor damage to the submarine cables above the waterline. Electrical testing indicated eight of the ten cables had sustained "extensive damage" below the waterline. PX4.

126. Lang reported that all spare electrical conductors had to be used to raise and lower the bridge leaves. No electrical conductors remained to reconnect indicating lights on the control console in the bridge tender house. Bridge operators raised and lowered the leaves with "almost no indicating lights on the control console to indicate when various life safety procedures [had] been accomplished. . . ." The bridge functions that no longer worked included: stop-and-go signals, bells, pedestrian and traffic gates, span motor brakes, on-off indicators, and the "nearly closed" and "fully closed" indicators. PX4.

127. The City also retained Collins Engineers, Inc. to conduct an underwater inspection of the western pier of the East 95th Street bridge. Collins conducted its inspection on April 30, 1998. APTO71; PX3.

128. Collins reported "significant impact related damage" to the eight northernmost submarine cables. The submarine cables had sustained "a considerable impact" in a northwesterly direction. Many of the cables were crushed or flattened. The majority of damage was to the sheathing, with fractured steel wires splayed, distorted or absent, cable insulation exposure and damage, and conductive wiring exposure and damage. APTO72; PX3.

129. The cables received widespread damage from the waterline to ten feet below the waterline. The submarine cables were in good condition from ten feet below the waterline to the channel bottom. Only the two southernmost submarine cables escaped damage. APTO72; PX3.

## L. REPAIRS AND LIQUIDATED DAMAGES

130. Aldridge Electric, Inc. submitted to the City of Chicago a contract bid of $530,000 for the East 95th Street bridge submarine cables replacement project. The City accepted the bid. APTO73; PX2.

131. Aldridge made permanent repairs to the East 95th Street bridge in late 1999 and early 2000. APTO74.

132. Aldridge Electric replaced the damaged submarine cables with a conduit cable system. Aldridge ran replacement cables through four, four-inch conduits. Each conduit was sealed to prevent exposure to water. The conduits were then placed around a metallic rod used to weigh down the conduits. The conduits and the rod were then bundled together. PX2.

133. Aldridge Electric placed the replacement cable bundle into a trench dug six feet into the bottom of the Calumet River. After the cable bundle had been laid, the trench was backfilled. Regulations required that the cable bundle, or any other type of replacement cable, including submarine cable, be placed into a trench and backfilled. APTO75; PX 2.

134. Aldridge Electric did not replace the original submarine cables with new submarine cables because of cost. Replacement submarine cables are far more expensive than the materials and methods used to replace the original ones. Had new submarine cables merely been laid on the river bottom, in contrast to the materials and methods used, the additional cost would have been approximately $100,000. PX2.

135. There were $50,745.99 in modifications to the City–Aldridge contract and $16,294.52 in liquidated damages related to EEO/CRO penalties. PX1.

136. The defendants did not introduce any evidence at trial relating to depreciation of the submarine cables.

137. The City's total liquidated damages as a result of the April 17, 1998 allision are indicated in the invoices paid to vendors and contractors listed below:

| INVOICE # | AMOUNT PAID | DATE PAID |
|---|---|---|
| T.Y.Lin International Bascor (including subcontractor Lang Assoc., Inc.) | | |
| # 97549418 | $ 2,369.24 (of $18,128.40 invoice) | 8/24/98 |
| # 97543064 | $ 1,878.16 (of $19,861.64 invoice) | 8/12/98 |
| **Subtotal** | **$ 4,247.40** | |
| Collins Engineers, Inc. | | |
| # 97751161 | $ 5,881.14 | 6/30/99 |
| # 97742105 | $ 22,032.83 | 6/27/99 |
| # 97739617 | $ 14,157.17 | 6/14/99 |
| # 97742104 | $ 1,295.88 | 6/17/99 |
| # 97739618 | $ 2,454.66 | 6/14/99 |
| # 97739619 | $ 7,869.06 | 6/14/99 |
| # 97993914 | $ 2,738.50 | 6/27/00 |
| **Subtotal** | **$ 56,429.24** | |
| Aldridge Electric, Inc. | | |
| # 97906129 | $290,993.80 | 3/15/00 |

| | | |
|---|---|---|
| # 97906130 | $105,400.12 | 3/15/00 |
| # 97906131 | $ 21,841.21 | 3/15/00 |
| # 97927877 | $ 95,520.88 | 4/20/00 |
| # 97927878 | $ 906.59 | 4/20/00 |
| # 98042739 | $ 44,702.07 | 10/18/00 |
| # 98042740 | $ 3,958.94 | 10/18/00 |
| # 98060476 | $ 1,127.86 | 11/27/00 |
| | | |
| **Subtotal** | **$564,451.47** | |
| | | |
| **TOTAL** | **$625,128.11** | |

SAPTO102; PX1; PX2.

## III. CONCLUSIONS OF LAW

■ 1. The Court has federal admiralty and maritime jurisdiction over this matter pursuant to 28 U.S.C. § 1333, as the allision arose out of navigation on the Calumet River. *See, e.g., Folkstone Maritime, Ltd. v. CSX Corp.*, 64 F.3d 1037 (7th Cir.1995).

2. Three admiralty rules of presumption have been raised by the parties. The *Pennsylvania* Rule operates as a presumption of cause against a vessel that violates a statute, while the *Oregon* and *Louisiana* Rules presume a vessel's fault for striking a fixed object. 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 14–3 (2001).

### A. The *Pennsylvania* Rule.

■ 3. The *Pennsylvania* Rule provides that:

The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

*The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873), *overruled in part on other grounds, United States v. Reliable Transfer*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

■ 4. The *Pennsylvania* Rule applies equally to collisions and allisions. *See Folkstone*, 64 F.3d at 1047 (citing *Orange Beach Water, Sewer & Fire Protection Auth. v. M/V Alva*, 680 F.2d 1374, 1381 (11th Cir.1982)).

■ 5. Application of the *Pennsylvania* Rule shifts the burden of proof and the burden of persuasion on causation to the party who violated a legislative mandate. *Id.*

■ 6. In this case, there was inadequate proof that the Defendants violated federal statutes established to prevent allisions, so as to trigger application of the *Pennsylvania* Rule. The *Morgan* had the right to rely on the rule that a vessel has an unfettered right to navigate the full width of a water channel. *Id.* at 1052 (citing *Pennzoil Producing Co. v. Offshore Express Inc.*, 943 F.2d 1465, 1470–71 (5th Cir.1991)).

■ 7. Similarly, there was inadequate proof that Plaintiff, the City of Chicago, was in violation of a permit (thus entitling the Defendants to presumptions under the *Pennsylvania* ) in failing to maintain the timber walers on the face of the East 95th Street bridge.

## B. The *Oregon* and *Louisiana* Rules.

 8. The *Oregon* Rule provides that a vessel under power that strikes a fixed object is presumptively at fault. *The Oregon*, 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943 (1895). The corollary *Louisiana* Rule provides that a drifting vessel that strikes a fixed object is also presumptively at fault. The *Louisiana*, 70 U.S. (3 Wall.) 164, 173, 18 L.Ed. 85 (1865).

9. It is irrelevant in this case whether the *Morgan* was under power or was drifting before and at the time of the allision with the East 95th Street bridge since the two rules address both possibilities. Thus, the Court will refer simply to the *Oregon* rule in the balance of these Findings and Conclusion.

 10. The *Oregon* rule operates against the ship as well as all parties, including the captain and the crew, participating in the management of the vessel at the time of the allision. *See, e.g., Wardell v. Department of Transportation*, 884 F.2d 510, 513 (9th Cir.1989).

10. The presumptive fault of the moving or drifting vessel derives from the common sense observation that vessels do not allide with fixed objects during the normal course of maritime navigation unless the vessel is mishandled in some way. *Folkstone Maritime*, 64 F.3d at 1050 (quoting *Wardell*, 884 F.2d at 512).

 11. The *Oregon* rule shifts both the burden of proof and the burden of persuasion to the vessel, which bears the risk of non-persuasion. *See Folkstone Maritime*, 64 F.3d at 1050. The party against whom the presumption of fault operates bears a burden of disproving it, not merely coming forward with countervailing evidence. *Delta Transload, Inc. v. M/V "Navios Commander"*, 818 F.2d 445, 449 (5th Cir.1987).

 12. The moving vessel may rebut the presumption by demonstrating, by a preponderance of the evidence, (1) that the allision was the fault of the stationary object, (2) that the moving vessel acted with reasonable care, or (3) that the allision was an unavoidable accident. *Id.* (citations omitted). *See also Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 503 (5th Cir. 1994). The last exception has also been stated as a defense of "inevitable accident." *See American Petrofina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324 (5th Cir.1988).

13. In this case, the Defendants failed to rebut the *Oregon* presumption of fault in any of the three exceptions.

 14. The defendants failed to rebut the presumption of fault of the *Oregon* Rule by proving either that the bridge or the submarine cables obstructed the *Morgan*'s navigation.

15. As to the bridge, the defendants failed to prove that the East 95th Street bridge, as constructed and maintained, obstructed maritime navigation in general or the *Morgan*'s navigation in particular.

16. Further, the East 95th Street bridge had not become an obstruction to navigation since the time of its construction either through the lack of maintenance or because of changes in the nature of maritime traffic.

 17. The Defendants also failed to rebut the presumption of fault of the *Oregon* Rule by proving that the allision was an unavoidable or inevitable accident. The evidence introduced at trial established that the allision was avoidable.

18. A vessel that asserts the unavoidable-accident defense has a heavy burden. *See Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir.1977) (quoting *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir.1967)). "Such vessels 'must exhaust every reasonable possibility which

the circumstances admit and show that in each they did all that reasonable care required.'" *Id.* Indeed, "cases of inevitable accident are so rare as to be virtually non-existent." 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 14–2, at 284 (2001).

> The common sense behind the rule makes the burden a heavy one. Such accidents simply do not occur in the ordinary course of things unless the vessel has been mismanaged in some way. It is not sufficient for the respondent to produce witnesses who testify that as soon as the danger became apparent everything possible was done to avoid an accident. The question remains, How then did the collision occur? The answer must be either that, in spite of the testimony of the witnesses, what was done was too little or too late or, if not, then the vessel was at fault for being in a position in which an unavoidable collision would occur.

*Bunge Corp.*, 558 F.2d at 795 (quoting *Patterson Oil Terminals v. The Port Covington*, 109 F.Supp. 953, 954 (E.D.Pa. 1952)).

■ 19. The proof a vessel must introduce to succeed in arguing the unavoidable-accident exception must establish that the vessel took all reasonable precautions under the circumstances known or reasonably anticipated, *see Petition of United States*, 425 F.2d 991, 995 (5th Cir.1970), and that the captain and crew used reasonable nautical skill. *See The Charles H. Sells*, 89 F.2d 631, 633 (2d Cir.1937). "To rebut the presumption of fault, the moving vessel must show that *it was not in her power* to prevent the damages by adopting *any* practical precautions." *Galveston Cty. Nav. Dist. No. 1 v. Hopson Towing Co.*, 877 F.Supp. 363, 369 (S.D.Tex.1995) (citing cases) (emphasis added).

20. The evidence failed to establish by a preponderance of the evidence that the *Morgan* or her crew could not have prevented the allision with the East 95th Street Bridge. In particular, the actions and time taken to secure the barges after the starboard winch brake failed appear to have been major factors in causing the allision. No one disputes that the brake on the winch was defective or did not work as it was supposed to work. This alone indicates fault on the part of the vessel. Under the *Oregon*, the Defendants are presumed at fault, and they have not proven that they were not negligent. The defendants provided no explanation of why the starboard winch brake failed to meet the evidentiary burden necessary to rebut their presumption of fault.

21. Although Captain Long testified that he plugged the control box to keep the barges faced up with the *Morgan* while waiting for Kindra to return to the *Morgan*'s deck, his actions in plugging it "three times" were insufficient to restore tension to the starboard line. The attempt to face up the barges by running a fiber or cloth line between the center capstan on the *Morgan* and the center cleat on the aft barge was an inefficient way to correct the problem of the barges canting to port. T73. First, casting a center line delayed drawing in the starboard line which could have been achieved while the crew was walking back to the *Morgan*'s deck. Second, the leverage would have been greater if the barges had been pulled in from the starboard side using the winch and face wire rather than pulling from the center bitt with a nylon line. T73–74.

22. Although the Court does not necessarily find specific acts of negligence on the part of the Defendants, the Court need not do so. Rather, the Defendants have not demonstrated by a preponderance of evidence that they were *not* at fault under the standards necessary to rebut the presumption under the *Oregon* rule.

### C. COMPARATIVE NEGLIGENCE—PROXIMATE CAUSE OF PLAINTIFF'S DAMAGES

23. Although the Court thus finds the Defendants liable for causing the allision, this does not end the inquiry. The Court also finds that the City was negligent (although not in violation of a permit) in its maintenance of the timberwalers over the cable slot. Specifically, if the timberwalers had been properly maintained, the damages to the cables would likely have been mitigated or avoided. The City had several years of notice of the deficiency and breached a duty to maintain the walers in a reasonable fashion. It was reasonably forseeable, given the configuration of the cable slot and its exposure to the water, that a vessel or perhaps large debris, could strike the cables without the timberwaler. The City's negligence was a proximate cause of the *damages* from the allision.

24. The Court disagrees with the City's position that it cannot have some contributory responsibility because its negligence was not a cause of the allision itself. *See American River Transp. Co. v. KAVO KALIAKRA SS*, 148 F.3d 446, 450 (5th Cir.1998). It is true that the *Morgan* would have allided with the East 95th Street Bridge (although perhaps not with the cables) regardless of the missing timberwalers. The Court here, however, is now concerned with the City's damages. The relevant question is "what is the proximate cause of the *damages* to the cables?" In this regard, "comparative negligence" applies. *See United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) ("when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault"); *see also Brother-hood Shipping Co. v. St. Paul Fire & Marine Ins. Co.*, 985 F.2d 323 (7th Cir. 1993) ("The rule in admiralty, when property damage results from a collision between ... ship and shore, is comparative negligence .... The plaintiff's negligence reduces the amount of damages that he can collect, but is not a defense to liability."). The Supreme Court has made clear that doctrines of proximate cause continue to apply in admiralty even after *Reliable Transfer. See Exxon Company, U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996) ("There is nothing internally inconsistent in a system that apportions damages based upon comparative fault only among tortfeasors whose actions were proximate causes of an injury.")

25. That is, the inquiry in the present case under the *Reliable Transfer* rule is the cause of the damages. Some confusion arises in the meaning of "fault" in *Reliable Transfer*, 421 U.S. at 411, 95 S.Ct. 1708. Is the "fault" that is to be apportioned or compared culpability only or causation as well? *See, e.g., Exxon*, 517 U.S. at 837 n. 2, 116 S.Ct. 1813 (recognizing an academic dialogue between a system of allocating damages based upon comparative culpability, on the one hand, and both comparative culpability and proximate cause, on the other) (citing sources). The Court concludes that the *Reliable Transfer* rule includes apportioning causation as well as culpability. *See* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law*, § 5–4, at 181 (2001) ("apportionment of liability is ordinarily made on the basis of comparative fault, but relative aspects of causation may also be considered especially where there is a reasonable basis for determining the contribution of each cause to a single harm"); *cf. Pan–Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129 (9th Cir.1977) ("When we

find that the 'fault' of each party will be compared, what we mean by 'fault' is that party's blameworthy conduct which contributes to the proximate cause of the loss or injury").[2] Maybe it is most often the case that a party whose negligence was not cause of a collision or an allision (as with the City's negligent maintenance of the fendering here) is also not a proximate cause of damages. But, as applied in the present case, the Court cannot overlook the City's independent negligence in causing its own damages. The negligence was an independent, though not superceding,[3] cause of the damages to the cables.

26. The Court therefore disagrees with the City's position that it, and its bridge, was merely an "eggshell skull" plaintiff, i.e., that the negligently-maintained fendering was merely a condition and not a cause of the allision.[4] Even a thin-skulled bicycle-rider could be contributorily-negli-

gent for failure to wear a helmet. *See Nunez v. Schneider Nat'l Carriers, Inc.,* 217 F.Supp.2d 562, 570 (D.N.J.2002) (concluding that decedent's failure to wear a helmet is admissible to prove decedent's comparative negligence in order to reduce damages). Similarly, a weak-boned driver could be contributorily-negligent in failing to wear a seat belt. *See, e.g., Waterson v. General Motors Corp.,* 111 N.J. 238, 544 A.2d 357, 370 (1988) ("the relevant inquiry is not whether the failure to use a seat belt contributed to the cause of the accident but whether the nonuse of a seat belt contributed to the plaintiff's injuries"). In this regard, *Waterson* recognized a theoretical distinction between straight comparative negligence and avoidable consequences, *id.* (citing cases), but concluded that "comparative negligence contemplates the inclusion of all relevant factors in arriving at appropriate damages awards." *Id.* These cases, although from an analo-

2. "In any event, whether we use the term comparative fault, contributory negligence, comparative causation, or even comparative blameworthiness, we are merely beating around the semantical bush seeking to achieve an equitable method of allocating the responsibility for an injury or loss. It comes down to this: the defendant is strictly liable for the harm caused from his defective product, except that the award of damages shall be reduced in proportion to the plaintiff's contribution to his own loss or injury." *Pan-Alaska,* 565 F.2d at 1139.

3. It might be said that the City's negligence *completely* caused its damages—i.e., if the City were not negligent in maintaining its fendering, the cables would not have been damaged even if the *Morgan* negligently allided with the bridge. The Court, however, finds that such negligence was not a superceding cause so as to cut-off Defendants' liability completely because such a superceding cause would need to be "extraordinary" negligence. *See Exxon v. Sofec,* 54 F.3d 570, 574 (9th Cir.1995), *aff'd,* 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996). Here, the City was negligent, but not extraordinarily negligent.

4. *See In re Tug Helen B. Moran,* 560 F.2d 527 (2d Cir.1977). In disapproving the "cause" versus "condition" distinction, the Second Circuit commented:

> If the defendant spills gasoline about the premises, he creates a "condition;" but his act may be culpable because of the danger of fire. When a spark ignites the gasoline, the condition has done quite as much to bring about the fire as the spark; and since that is the very risk which the defendant has created, he will not escape responsibility.... "Cause" and "condition" still find occasional mention in the decisions; but the distinction is now almost entirely discredited. So far as it has any validity at all, it must refer to the type of case where the forces set in operation by the defendant have come to rest in a position of apparent safety, and some new force intervenes. But even in such cases, it is not the distinction between "cause" and "condition" which is important, but the nature of the risk and the character of the intervening cause.

*Id.* at 528 n. 3 (*citing* W. Prosser, *The Law of Torts* 247–48 (4th ed.1971)).

gous context, are nothing more than an application of the Restatement (Second) of Torts, § 465. Section 465 provides in pertinent part:

Causal Relation Between Harm and Plaintiff's Negligence

(1) The plaintiff's negligence is a legally contributing cause of his harm if, but only if, it is a substantial factor in bringing about his harm and there is no rule restricting his responsibility for it.

(2) The rules which determine the causal relation between the plaintiff's negligent conduct and the harm resulting to him are the same as those determining the causal relation between the defendant's negligent conduct and resulting harm to others.

Comment c to section 465 is particularly applicable. It provides:

c.... [T]he rules stated in § 433 A as to the apportionment of harm to different causes are applicable in cases of contributory negligence. Where the harm is single and indivisible, it is not apportioned between the plaintiff and the defendant, in the absence of a statute providing for such division of the damages upon an arbitrary basis. Where, however, there are distinct harms, or a reasonable basis is found for the division of a single harm, the damages may be apportioned, and the plaintiff may be barred only from recovery for so much of the harm as is attributed to his own negligence. Such apportionment is commonly made, under the damages rule as to avoidable consequences, where the plaintiff suffers an original injury, and his negligence consists in failure to exercise reasonable care to prevent further harm to himself. See § 918. The apportionment may, however, be made in other cases, as where, for example, the plaintiff has contributed to the pollution of a stream, along with one or more defendants.

*Such apportionment may also be made where the antecedent negligence of the plaintiff is found not to contribute in any way to the original accident or injury, but to be a substantial contributing factor in increasing the harm which ensues.* There must of course be satisfactory evidence to support such a finding, and the court may properly refuse to permit the apportionment on the basis of mere speculation. (Emphasis added.)

27. Although the Court does not specifically apply an "avoidable consequences" theory here, the Court notes that, to the extent the theory was limited to *post*-accident negligence,[5] the Restatement (Third) of Torts regarding "comparative responsibility" abolishes such a distinction. *See* Restatement (Third) Torts, § 3 (2000) (Ameliorative Doctrines for Defining Plaintiff's Negligence Abolished). Comment b of the reporter's notes to section 3 explains in part as follows: "Conduct that causes an accident may be more serious than conduct that merely affects the extent of an injury. This section merely provides that a plaintiff's *pre-accident* negligence that aggravates the injury is not categorically removed from consideration." *Id.* at 40 (emphasis in original). The Court applies the same rationale here in answer to any suggestion that a plaintiff's own negligence is only relevant if it occurs after the accident. *See, e.g., Hutchins v. Schwartz,* 724 P.2d 1194, 1199 (Alaska 1986) ("when the plaintiff's pre-injury conduct does not cause the accident but aggravates the ensuing damages, then damage reduction is 'the better view unless we are to place an entirely artificial emphasis

---

5. *See, e.g., Pennzoil Producing Co. v. Offshore Express, Inc.,* 943 F.2d 1465, 1474–75 (5th Cir.1991) (indicating that the doctrine of avoidable consequences is limited to post-injury negligence).

upon the moment of impact, and the pure mechanics of causation.'") (*quoting Foley v. City of West Allis*, 113 Wis.2d 475, 335 N.W.2d 824, 830 (1983) (*quoting* Prosser, *Law of Torts* § 65, at 423–24 (4th ed.1971))).

▮ 28. A slightly different analytical approach to the meaning of *Reliable Transfer* is to apply the Restatement (Second) of Torts, § 433A.[6] In short, if damages for an injury can be divided by causation, then they may be apportioned appropriately. *See also* Restatement (Third) Torts, § 26 (2000) (Apportionment of Liability When Damages Can be Divided by Causation). Doing so leads to the same conclusion as applying section 465.

29. The Court therefore finds that the City's own negligence in improperly maintaining the timberwalers over the cable slot was also a proximate cause of its damages. The Court apportions the loss 50% to the City and 50% to the Defendants. Any damages incurred by the City shall be cut in half.

## IV. DAMAGES, INTEREST, AND COSTS

### A. The City Is Owed Its Liquidated Damages.

▮ 30. Admiralty's new-for-old rule does not apply in this case. *See 2 Admi-*

*ralty and Maritime Law* at § 14–6 & n. 25.

31. For the new-for-old rule to apply and reduce the City's compensable damages, the defendants would have had to have introduced evidence that the submarine cables had depreciated in value before the allision. *See id.* The defendants, however, presented no evidence that the submarine cables had depreciated in value before the allision.

32. The new-for-old rule also does not apply because the City did not replace the damaged submarine cables with new submarine cables. Rather, Aldridge Electric replaced the submarine cables with a conduit system, saving the City approximately $100,000. PX2.

33. The defendants' failure to introduce any evidence that the submarine cables had depreciated in value before the allision means that the City must be compensated in full for its $625,128.11 loss (prior to reducing the damages by half for the City's own negligence). *See id.; see also City of New Orleans v. American Commercial Lines, Inc.*, 662 F.2d 1121, 1124 (5th Cir.1981).

---

**6.** Section 433A provides:

(1) Damages for harm are to be apportioned among two or more causes where
 (a) there are distinct harms, or
 (b) there is a reasonable basis for determining the contribution of each cause to a single harm.
(2) Damages for any other harm cannot be apportioned among two or more causes.

Comment a provides:

a. The rules stated in this Section apply whenever two or more causes have combined to bring about harm to the plaintiff, and each has been a substantial factor in producing the harm, as stated in §§ 431 and 433. They apply where each of the causes in question consists of the tortious conduct of a person; and it is immaterial whether all or any of such persons are joined as defendants in the particular action. The rules stated apply also where one or more of the contributing causes is an innocent one, as where the negligence of a defendant combines with the innocent conduct of another person, or with the operation of a force of nature, or with a preexisting condition which the defendant has not caused, to bring about the harm to the plaintiff. The rules stated apply also where one of the causes in question is the conduct of the plaintiff himself, whether it be negligent or innocent.

### B. The City Is Also Owed Pre–Judgment Interest Beginning On The Allision Date.

34. Prejudgment interest on a monetary award for an admiralty tort is calculated from the allision date to the judgment date. *See City of Milwaukee v. Cement Division, Nat'l Gypsum Co.*, 515 U.S. 189, 195, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995).

35. Prejudgment interest should be calculated at the prime rate, compounded annually, because that calculation of prejudgment interest fully compensates the injured party. *See Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1115 (7th Cir.1998)..

36. Consequently, this court should calculate prejudgment interest for the City at the prime rate, compounded annually, beginning with the April 17, 1998 allision date and ending with the judgment date. *Id.*

### C. The City Is Owed Its Costs.

37. The City is entitled to its costs and the City may file the appropriate bill of costs pursuant to Local Rule 54.1.

### V. CONCLUSION

For the foregoing reasons, the Defendants are liable to the Plaintiff City of Chicago for $312,564.05 (50% of $625,128.11), plus applicable pre-judgment interest and costs. The City is granted 30 days leave to file a submission with appropriate substantiation of the amount of prejudgment interest, as well as a bill of costs.

IT IS SO ORDERED.