# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-1789

CITY OF CHICAGO,

*Plaintiff-Appellee*,

v.

M/V MORGAN, KINDRA LAKE TOWING, L.P.,
and KINDRA LAKE TOWING, INC.,

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CV 46—**Samuel P. King**, *Judge* (sitting by designation).

_____

ARGUED NOVEMBER 5, 2003—DECIDED JULY 9, 2004

_____

Before FLAUM, *Chief Judge*, and BAUER and WILLIAMS,
*Circuit Judges*.

WILLIAMS, *Circuit Judge*. The M/V Morgan, a tugboat
pushing four barges, allided[1] with the 95th Street Bridge in
Chicago, Illinois. The impact disabled the bridge, severing

_____

[1] An allision occurs when a vessel strikes a stationary object. 2
Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 14-2 (2d ed.
1994).

eight of its ten electrical cables. A suit by the City followed. The district court, applying the *Oregon* presumption of fault against a moving vessel which strikes a stationary object, *The Oregon*, 158 U.S. 186 (1895), found the M/V Morgan presumptively at fault based on its negligent reaction to a mechanical failure but also held the City partially liable for the allision for failing to adequately protect the electrical cables. The court determined that the parties were equally liable and apportioned damages accordingly. The M/V Morgan appeals, arguing that the district court erred in its application of the *Oregon* rule and its apportionment of damages. We find that the *Oregon* rule applies, the M/V Morgan failed to exonerate itself from liability, and the record supports the district court's decision to apportion damages equally. Therefore, we affirm.

## I. BACKGROUND

On April 17, 1998, the M/V Morgan,[2] a 134-ton tugboat, was pushing four barges, weighing approximately 5,000 tons, down the Calumet River in Chicago, Illinois, from the Federal Marine Terminal to the Ceres Trans-Oceanic Service Terminal, a trip which required passing under the 95th Street Bridge. During its voyage, the M/V Morgan's starboard winch[3] brake failed causing its crew to lose control of the vessel and strike the western pier face of the 95th Street Bridge. The foremost barge struck the bridge at an acute angle such that it entered a recessed slot which housed the cables.

The 95th Street Bridge is managed and maintained by the City of Chicago in trust for the general public. The bridge

---

[2] The M/V Morgan is owned by Kindra Lake Towing, L.P. References to the M/V Morgan encompass all relevant defendants.

[3] A winch is a mechanical device used for drawing in and loosening a line.

uses submarine electrical cables to control its mechanical functions. The electrical cables run from the eastern pier face of the bridge, 25 feet below the waterline, to its western pier face. From its western pier face, the cables travel above ground into a machine house, from which the bridge operator controls the opening and closing of the bridge. Though the full distance from the eastern to the western side of the bridge is 206 feet, the navigable waterway spans only 200 feet and the portion of the bridge which houses the electrical cables on the western pier face is outside of the navigable channel. To protect the super-structure of the bridge from common allisions, horizontal rubbing, or incidental contact with vessels, the City installed protective dolphins[4] and fenders[5] along the sides of the bridge. The City attempted to protect the submarine cables by placing them in a recessed slot; however, the cables remained exposed to river debris or vessels moving at certain angles. Prior to 1994, the recessed slot was also covered by a wooden fender.[6] However, upon the deterioration of the fender, the City chose not to replace it.[7]

---

[4] A dolphin is a pile cluster, here composed of wood and steel, placed near the draw of the bridge which protects the bridge's most vulnerable areas including its underwater substructure.

[5] The fender system is comprised of long planks of wood, placed along the face of the substructure of the bridge.

[6] The United States Coast Guard files for the 95th Street Bridge indicate that its original design plans from December 19, 1958, contained fender-covers for the recessed slot. However, the permit issued for the construction of the bridge did not include a fender system.

[7] A December 1994 report, prepared by one of the City's outside consultants, recommended replacing the fender system. However, the City's Deputy Commissioner Chief Engineer of the Department of Transportation, Bureau of Bridges, Stan

(continued...)

The M/V Morgan's crew included James Long, serving as Captain, Brian Grzybowski, the deck engineer, and John Kindra and Ryan Campbell, serving as deck hands. The crew was inexperienced with the M/V Morgan. Captain Long began his employ with Kindra Inc. two and one half months prior to the accident, while Kindra and Campbell had primarily served in an administrative capacity as office staff.

The four barges were tied two long and two abreast, forming a square. The M/V Morgan was positioned behind the barges, which allowed it to push the barges forward. The barges and the boat were connected at three points. First, the nose of the boat abutted the two rear barges at the center point of the boat. This connection was maintained solely through contact rather than by an independent line. The second point of connection was a line which ran from the winch located on the starboard (right) deck of the vessel to the starboard cleat[8] on the rear-most barge. Lastly, another line ran from the winch located on the port (left) deck of the vessel to the port cleat on the rear-most barge. The two winches on the M/V Morgan were approximately four feet high and controlled electrically.[9] When the winch lines are taut, the M/V Morgan and barges form a single body, and the vessel is deemed "facing up." Winches control the degree of tension on the lines and in turn control the steering of the unit. Winch brakes also maintain the

---

[7] (...continued)
Kaderbek, deemed replacement of the fender over the recessed slot a low priority and focused on the dolphin system as the bridge's primary protective measure.

[8] A cleat is a two-horned fitting used to secure a line.

[9] The winch controls are located in the pilot house. Two buttons control each winch. A green button drew in the line and a red button released the line and also held it automatically in place.

tension on the line when the vessel's motor is not powered. Thus, if the starboard winch line is released, the vessel turns left and if the port winch line is released, the vessel turns right.

To depart from the Federal Marine dock that morning, Captain Long directed the crew to tighten the winch lines, start the vessel's motor and draw in the starboard winch line to move the vessel right and away from the dock. Captain Long then put the boat in reverse and slowly began to back out of the dock. As the vessel proceeded, he noticed that the rear of the M/V Morgan was too close to the dock. In response, he put more slack in the starboard winch line to force the rear of the vessel to move away from the dock. After achieving a safe distance from the dock and down the river, Captain Long tightened the starboard winch line using the green button on the control panel to face up the M/V Morgan. However, when he released the green button controlling the starboard winch line, the starboard winch brakes failed and the line began paying out (unwinding). This caused the vessel to turn to port (left). The starboard winch brake failure also meant that the Captain lost the ability to steer the vessel to starboard (right).

Captain Long responded to this unexpected mechanical failure by contacting Grzybowski by radio and asking him to send someone to the deck of the M/V Morgan to stop the paying out of the starboard winch line. To reduce the forward momentum of the vessel, Captain Long put the engines in reverse. He also radioed the bridge and asked that it be opened to prevent the vessel's coaming[10] from striking the underside of the bridge. At this time, the vessel was approximately 100 feet south of the bridge and favoring port (gliding left).

---

[10] The coaming is a raised frame around the deck of the vessel used to keep out water.

Kindra responded to Grzybowski's request, although he had to travel over 400 feet from the front end of the barges, across the vessel, to the starboard winch. Captain Long directed Kindra, by radio, to dog the starboard winch, which prevents the winch line from unwinding, and also to put out a fiber line from the center of the vessel to the center of the barges. The fiber line alone would not have caused the M/V Morgan to line up, but, both measures caused the vessel and the barges to properly face up. By this time, the lead barges were passing under the draw of the bridge.

While moving at approximately one mile per hour, the barge made contact with the bridge. It slid down the fenders located on the western pier face and into the recessed slot which housed the electrical wires without causing any visible damage to the fenders it impacted or to the barge itself. The impact was so slight that neither Long nor Kindra were aware that the barge had made contact with the bridge. Even at this slow speed, however, the vessel's angular impact damaged the bridge by severing the electrical cables. The damage was extensive, requiring replacement of the eight cables which cost the City of Chicago $625,128.11.

The district court conducted a two-day bench trial, during which the M/V Morgan presented evidence that the starboard winch functioned properly on the morning of April 17 prior to the accident and that winches were inspected weekly. However, Grzybowski, the deck engineer, was not able to identify which day of the week was designated for inspection, the last day the winches were actually inspected, or which member of the crew inspected the winches on the day of the accident. In addition, the Captain admitted that he did not inspect the winches as he did not consider that a necessary part of his routine. The court then rendered a written decision listing several findings of fact which this court will accept absent clear error. *Folkstone Maritime, Ltd. v. CSX Corp.*, 64 F.3d 1037, 1046 (7th Cir. 1995). Specifically, the trial court found the following:

17. It is fairly common for barges and vessels to touch or rub—and in that sense "allide" with—the substructures of bridges.

18. When a vessel allides with a bridge in the City of Chicago the damage to the bridge is most often to the superstructure.

19. It is more common for a vessel to allide with a bridge through rubbing rather than striking at an acute angle.

20. There was no evidence presented of any specific allision with the East 95 Street bridge before April 17, 1998.

37. Without a fender or timber waler, the cables were exposed to the river. The cables, however, were protected from sideways, i.e., parallel, contact by being placed in a slot. It was nevertheless reasonably foreseeable that the cables could be damaged by a minor allision in the form of the fairly common "rubbing" or "touching."

85. Long has no explanation why the brake shoes on the starboard winch failed.

104. One way to have restored tension to the starboard line earlier would have been to draw in the starboard line using the motor on the winch. That is, even if the brake in the winch did not hold, the line could have been drawn in periodically.

105. If Long had used the motor on the starboard winch to draw in the starboard line, he might have been able to maintain tension on the line by intermittently punching the control button for the winch.

106. Long recalls punching the control button for the winch about three times. He also described his actions in this regard as "continually" or "intermittently"

hitting it to get it to come in. The button on the winch is an electrical connection; therefore, once the button is pushed, the motor should almost instantaneously begin to draw in the wire. On the other hand, continually holding down the winch button could blow the breaker.

111. If the timber waler had been in place across the cable slot, the port bow corner of the barge would have slid along the timber waler and probably would not have contacted the cables.

*City of Chicago v. M/V Morgan*, 248 F. Supp. 2d 759, 763-69 (N.D. Ill. 2003) (internal citations omitted). Applying pure comparative fault principles, the district court found that both parties were responsible for the damage and apportioned fault equally between them.

## II. ANALYSIS

The M/V Morgan makes several arguments on appeal. First, defendants contend that the *Oregon* presumption is unnecessary and inapplicable because the facts of the case are apparent and the accident was an "expected" and "minor" allision. Second, defendants assert that even if we find the application of the presumption appropriate, we should deem it rebutted and exonerate the vessel from liability. Defendants seek exoneration based on the district court's determination that the City's decision not to replace the wooden fender over the recessed slot was a proximate cause of the allision. They also maintain they were without fault as they contend that the allision was an "inevitable accident." Finally, defendants take issue with the district court's apportionment of liability between the parties, arguing that an equal apportionment is not supported by the record and is contrary to this court's cost avoidance doctrine and the general principles of comparative fault.

**A.  The *Oregon* Rule**.

The *Oregon* rule creates a rebuttable presumption of fault against a moving vessel, which under its own power, allides with a stationary object. 158 U.S. at 192-93. As a conclusion of law, we review the district court's decision to apply the *Oregon* rule to the underlying matter de novo.  *See Union Pac. R.R. Co. v. Kirby Inland Marine, Inc.*, 296 F.3d 671, 674 (8th Cir. 2002) (applying de novo review to determine whether the district court properly applied the rule of *The Pennsylvania,* 86 U.S. 125 (1873), over the *Oregon* rule).[11] However, we review for clear error the district court's factual findings, *Folkstone Maritime, Ltd.*, 64 F.3d at 1046, and apportionment of fault, *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee* (*National Gypsum*), 915 F.2d 1154, 1159 (7th Cir. 1990) (citing *McAllister v. United States*, 348 U.S. 19, 20 (1954)). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Id.* (citing *United States v. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Furthermore, when sitting in admiralty, we treat a district court's findings of negligence as factual determinations also reviewed for clear error. *Folkstone Maritime, Ltd.*, 64 F.3d at 1046.

---

[11] We agree with the district court's determination that whether the M/V Morgan is deemed "drifting" and therefore subject to the *Louisiana* presumption of fault against a vessel which drifts into a stationary object, *The Louisiana*, 70 U.S. 164 (1865), or "under power" and subject to the *Oregon* rule, the analysis remains unchanged. We also agree that the *Pennsylvania* rule, which creates a presumption of fault against a vessel that is found to have violated a statutory rule intended to prevent allisions, does not apply as the City was under no statutory duty to erect and maintain the fender system over the cable slot. *See supra* note 6.

In admiralty, "[t]hose in control of the vessel's navigation must bear the greater responsibility for bringing their ship safely into and out of port." *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 802 (5th Cir. 1977). Applying this logic, the *Oregon* rule is premised on "the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way." *Folkstone Maritime, Ltd.*, 64 F.3d at 1050 (quoting *Wardell v. Nat'l Transp. Safety Bd.*, 884 F.2d 510, 512 (9th Cir. 1989)). This presumption merely addresses a party's burden of proof and/or burden of persuasion; it is not a rule of ultimate liability. *Folkstone Maritime, Ltd.*, 64 F.3d at 1050. Generally, presumptions "are designed to fill a factual vacuum," and if the facts of a case are apparent, the need for a presumption is eviscerated. *Rodi Yachts, Inc. v. Nat'l Marine, Inc.*, 984 F.2d 880, 887 (7th Cir. 1993).

Liability will not arise unless a party's act or omission is a "substantial" and "material" factor in causing the allision. *American River Trans. Co. v. Kavo Kaliakra S.S.*, 148 F.3d 446, 450 (5th Cir. 1998). If, however, the vessel's contact with the stationary object is "expected" or "minor," the presumption is not applied unless that contact rises "above a certain minimal level." *See American Petrofina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324, 1326 (5th Cir. 1988) (recognizing that slight damage to a fender system during "normal docking" may fall outside the purview of the presumption) (collecting cases); *Manufacturers Rys. Co. v. Riverway Harbor Serv. St. Louis*, 646 F. Supp. 796, 798 (E.D. Mo. 1986) (same).

Application of the *Oregon* presumption does not supplant the general negligence determination which requires a plaintiff to prove the elements of duty, breach, causation and injury by a preponderance of the evidence; rather, it merely satisfies the plaintiff's *prima facie* case. *Bunge Corp.*, 558 F.2d at 798; *Brown and Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir.

1967). Once fault is presumed the defendant may come forward with evidence to rebut the presumption, *The Oregon*, 158 U.S. at 192-93, by showing that: (1) the allision was actually the fault of the stationary object; (2) the moving vessel acted with reasonable care; or (3) the allision was the result of an inevitable accident. *Folkstone Maritime, Ltd.*, 64 F.3d at 1050 (finding *Oregon* presumption rebutted when bridge failed to fully open); *I&M Rail Link, L.L.C. v. Northstar Navigation, Inc.*, 198 F.3d 1012, 1013 (7th Cir. 2000) (finding *Oregon* presumption rebutted and remanding for trial when bridge was an unreasonable obstruction to navigation); *Graves v. Lake Michigan Car Ferry Transp. Co.*, 183 F. 378, 380 (7th Cir. 1910).

Rebutting the presumption does not necessarily exonerate the vessel from all liability. Under the principles of pure comparative fault, both parties may be found to have contributed to the accident. "When two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975); *Brotherhood Shipping Co., Ltd. v. St. Paul Fire & Marine Ins. Co.*, 985 F.2d 323, 325 (7th Cir. 1993). Therefore, under the comparative fault analysis between a vessel and a stationary object, a vessel may minimize its liability by providing evidence that the stationary object contributed to the injury it incurred, however, it will be absolved of liability only if the stationary object is deemed the *sole* proximate cause of the injury. *Bunge Corp.*, 558 F.2d at 802 (emphasis added).

## B.  The *Oregon* presumption applies.

The parties agree that the allision with the 95th Street bridge was the result of the crew of the M/V Morgan losing control of the vessel due to the mechanical failure of the starboard winch. While the "parties have introduced evidence to dispel [some of] the mysteries" of what occurred during the accident, *Rodi Yachts, Inc.,* 984 F.2d at 887, the M/V Morgan has not supplied any reason for the mechanical failure. The vessel asks this court to focus on its reaction once the mechanical failure occurred, however, this does not resolve the question of what caused the starboard winch brake to fail. This lack of an explanation is sufficient to find a "factual vacuum" meriting the application of the presumption. Furthermore, in *Rodi Yachts*, this court reasoned that "as between [a] drifting vessel and stationary object struck by it common sense suggests that the former is more likely to have been at fault than the latter. . . ." *Id.* at 886-87.

Nor was the M/V Morgan's contact with the 95th Street Bridge the type of "expected" and "minor" contact which occurs during a "normal docking."[12] *See American Petrofina Pipeline Co.,* 837 F.2d at 1326 (arguing for the inapplicability of the *Oregon* presumption where the vessel was properly piloted, the contact made with the fender system occurred during a "normal docking" and was minimal, and the fenders were defective). It is undisputed that the barge contacted the bridge at an angle sharp enough for it to

---

[12] We note that the M/V Morgan's contention that the *Oregon* rule should not apply to "expected" or "minor" allisions is in fact a challenge to the district court's factual findings that boats generally do not allide with the structure of a bridge at an acute angle and that the damage caused to the bridge was extensive. Therefore, the standard of review for these determinations is not the de novo standard applied to questions of law, but rather we review these findings to determine whether they are clearly erroneous. *Folkstone Maritime, Ltd.,* 64 F.3d at 1048.

enter the recessed slot which housed the electrical cables. The district court expressly found that common allisions do not occur at acute angles. Thus, the district court's finding suggests that the allision at issue was not a common parallel rubbing which would constitute "expected" contact.

Also, the western pier face of the bridge, which housed the severed cables, is outside the navigable waterway and therefore contact with this portion of the bridge is not "expected" or frequent. Lastly, the district court also correctly found that damage to the bridge was extensive. We recognize that the vessel was moving very slowly when impact was made, however, the speed of the tugboat is not determinative of whether the impact was minor. The contact caused substantial damage, in the amount of $625,128.11, and cannot be characterized as "minor." Therefore, the district court properly applied the *Oregon* presumption of fault to the M/V Morgan.

### C. Defendants have failed to rebut the *Oregon* presumption or exonerate themselves from liability.

The M/V Morgan has failed to rebut the *Oregon* presumption or exonerate itself from liability by proving either that (1) the allision was the sole fault of the bridge, (2) it acted reasonably, or (3) the allision was the result of an "inevitable accident." In addition, the *in extremis* doctrine does not aid the M/V Morgan.

### 1. The allision was not the sole fault of the stationary object.

To prove that the allision was the sole fault of the bridge and exonerate itself from liability, the M/V Morgan asks this court to draw a distinction between what it character-

izes as the "actual fault" of the bridge and the "presumed fault" of the vessel.[13] For the purposes of this analysis, we find no real distinction between "presumed fault" and "actual fault." As discussed above, presumptions are merely tools used by courts to analyze the facts which underlie an allision and address any factual voids in the record. A presumption implicates the burden of production and proof, not the ultimate liability determination. *Folkstone Maritime, Ltd.*, 64 F.3d at 1050.

The district court found that the City's decision not to replace the fender over the recessed slot was not the *sole* cause of the damage to the electrical cables. *See White Stack Towing Corp. v. Hewitt Oil Co.*, 216 F.2d 776, 778-79 (4th Cir. 1954) (exonerating vessel of liability when damage to breasting dolphins was solely caused by their negligent construction and vessel was properly piloted during docking). Under a pure comparative fault analysis, "[t]he plaintiff's negligence reduces the amount of damages that he can collect, but it is not a defense to liability." *Brotherhood Shipping Co., Ltd.*, 985 F.2d at 325 (citing *Reliable Transfer Co.*, 412 U.S. at 397); *Bryant v. Partenreederei-Ernest Russ*, 352 F.2d 614, 615 (4th Cir. 1965) (in admiralty "contribu-

---

[13] The M/V Morgan points to the following language in the district court opinion in support of this distinction: "Although the Court does not necessarily find specific acts of negligence on the part of the Defendants, the Court need not do so. Rather, the Defendants have not demonstrated by a preponderance of the evidence that they were *not* at fault under the standards necessary to rebut the presumption under the *Oregon* rule." *M/V Morgan*, 248 F. Supp. 2d at 724 (emphasis in original). To support its argument concerning the significance of the City's "actual fault," defendants seize on the district court's statement that the City's negligence in failing to replace the fender system over the recessed slot "was a proximate cause of the damages from the allision." *Id.* at 775.

tory negligence is properly considered in mitigation of damages.").[14]

The district court's finding that the fender system (or lack thereof) contributed to the accident is supported by the record and therefore was not clearly erroneous. The district court reasoned that while the City placed the cables in a recessed slot to protect them, placing a wooden fender in front of the slot would have likely prevented the accident. Thus, the court determined that while the City took some preventative action, it did not take sufficient action. On the part of the defendants, the court found that the crew's response to the starboard winch brake failure was unreasonable in that it was not able to face up the M/V Morgan and this negligence lead to the unusual angular impact. It was therefore proper for the court to decrease the M/V Morgan's percentage of liability in proportion to the plaintiff's relative degree of fault.

----

[14] The district court also properly rejected defendants' superceding cause argument. "The doctrine of superceding cause is thus applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable." 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5-3 (4th ed. 2004). Here, the City's decision not to replace the wooden fender over the recessed slot was not a superceding cause of the injury to the cables because it did not cut off the M/V Morgan's negligence in failing to face up the vessel after the mechanical failure of the starboard winch. *See Exxon Co. v. Sofec, Inc.,* 517 U.S. 830, 837-38 (1996) (discussing the continued viability of the superceding cause doctrine after *Reliable Transfer Co.*). The City's decision not to replace the fender could be deemed a superceding cause if, for example, the cables were left completely open, in a navigable waterway, with no protection whatsoever, and the M/V Morgan's contact with the cables was made at a parallel angle. This would amount to the type of "extraordinary" negligence necessary to break the causal nexus and completely shield the defendants from liability. *See id.*

### 2. The vessel did not react to the mechanical failure in a reasonable manner.

The M/V Morgan's fault is based on the district court's finding that the defendants could have prevented the angular impact by properly facing up the M/V Morgan. Specifically, the district court found that: (1) the M/V Morgan did not respond reasonably to the starboard winche's failure; (2) the crew was inexperienced with the M/V Morgan; (3) the crew was not diligent in its maintenance of the vessel's winches in that they did not inspect the winches that day and could not recall when they were last inspected; (4) Captain Long's decision to cast a center line was unreasonable in that it delayed drawing in the starboard winch line; and (5) Captain Long's decision to plug the control box was ineffective to restore tension to the winch line.[15] The district court was correct that the vessel must bear some of the responsibility for the allision. *See American River Trans. Co.*, 148 F.3d at 450 (finding a drifting vessel liable for alliding with a moored barge based on the vessel's negligent reaction to the mechanical failure of its steering system); *In re American Milling Co.*, 270 F. Supp. 2d 1068, 1091 (E.D. Mo. 2003) (holding a vessel liable for an allision with a bridge when the vessel failed to prove that a mechanical failure caused the allision as opposed to the captain's navigational errors).

---

[15] It is important to note that these facts support a finding of negligence against the defendants absent the presumption. *See* 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5-2 (4th ed. 2004). These facts clearly demonstrate that "the allision could have been prevented by the exercise of due care." *Folkstone Maritime Ltd.*, 64 F.3d at 1046 (citing *The Jumna*, 149 F. 171, 173 (2d Cir. 1906). *See also* Paige Hess, *Applying the Pennsylvania Rule—Circumstances to Consider in Allisions: American River Transportation Co. v. M/V Kavo Kaliakra*, 24 Tul. Mar. L.J. 343, 352 (1999) ("In light of modern day technology and practices, the value of such presumptions has diminished. . .").

### 3. The allision was not the result of an "inevitable accident."

The "inevitable accident" doctrine applies when "the cause of the collision was a cause not produced by [the vessel], but a cause of which [the vessel] could not avoid." *The Olympia*, 61 F. 120, 123 (6th Cir. 1894). Generally, this doctrine is invoked when an act of God, or *vis major*, causes a vessel to collide with another object or vessel. *The Louisiana*, 70 U.S. at 173; *Frost v. Saluski (The Blue Goddess)*, 199 F.2d 460, 462 (7th Cir. 1952). "Unless it appears that both parties have endeavored by all means in their power, with due care and a proper display of nautical skill, to prevent the collision, the defense of inevitable accident is inapplicable to the case." *The Clarita*, 90 U.S. 1, 13 (1874). Therefore, the defense cannot be "sustained where it appears that the disaster was caused by negligence." *Id.*; *American River Transp. Co., Inc. v. Paragon Marine Serv., Inc.*, 329 F.3d 946, 947 (8th Cir. 2003). If applicable, each party is responsible for his respective damages and no liability attaches. *The Continental*, 81 U.S. 345, 355 (1872).

The doctrine has been applied to collisions brought about by a vessel's loss of control due to a mechanical failure, however, the inquiry is whether the defect which caused the malfunction was latent in nature or detectible by the vessel through proper inspection. *See The Olympia,* 61 F. at 122;[16] *Cranberry Creek Coal Co. v. Red Star Towing & Transp. Co.*, 33 F.2d 272, 274 (2d Cir. 1929) (finding that vessel

---

[16] "The defendants say 'Our tiller rope broke, and the vessel became unmanageable, and the collision was unavoidable.' That only shows that the breaking of the tiller rope was the cause of the collision. They must go further, and show that the cause was operated to break the tiller rope was unavoidable. The collision was but the result of the cause which produced a broken tiller rope. If that cause is not shown to be unavoidable, how can it be said that the collision was an inevitable accident?" *Id.*

failed to rebut presumption of fault by proving "inevitable accident" when it failed to present evidence that mechanical defect was latent or that the vessel was properly maintained and inspected); *The William E. Reed Hudson River Shipyards Corp. v. Metropolitan Sand & Gravel Corp.*, 104 F.2d 167, 168 (2d Cir. 1939) (finding that the vessel failed to establish "inevitable accident" defense as it did not present evidence that broken steering gear was in good condition prior to accident, properly or frequently inspected, or purchased from a reputable manufacturer); *Arkansas River Co. v. CSX Transp.*, 780 F. Supp. 1138, 1142 (W.D.Ky. 1991); Meadows and Markulis, *Apportioning Fault in Collision Cases*, 1 U.S.F. Mar. L.J. 1, 21 (1989) (discussing applicability of the inevitable accident doctrine when a collision occurs as a result of a latent defect in properly inspected and maintained vessel machinery).

The M/V Morgan failed to prove that the accident was inevitable. The vessel did not put forth any evidence that the defect in the starboard winch was latent or could not be uncovered through proper inspection. In fact, the defendants testified that they did not know when the starboard winch was last inspected or who was responsible for its continued inspection. Most importantly, the district court found that the M/V Morgan could have prevented the accident by properly handling the vessel after the mechanical failure. This finding suggests that the allision was not caused by the failure of the starboard winch, but rather by the subsequent mishandling of the vessel. *See In re American Milling Co.*, 270 F. Supp. 2d at 1091 (rejecting the "inevitable accident" defense when captain could have prevented the allision by properly handling vessel after failure of rudders); Meadows and Markulis, *supra* (an inevitable accident is one "which occurs without fault"). Thus, the defendants have not sustained the very heavy burden of proving that the accident was inevitable.

### 4.   The *in extremis* doctrine is inapplicable.

Sometimes confused with the inevitable accident doctrine, the *in extremis* doctrine or "agony of the moment defense" applies when a ship is placed in sudden peril through no fault of its own and is forced to take "evasive maneuvers that may be a violation of a rule." 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 14-2 n. 49 (4th ed. 2004). *See, e.g.*, *N.M. Paterson & Sons, Ltd. v. City of Chicago*, 324 F.2d 254, 259 (7th Cir. 1963) (applying *in extremis* doctrine to absolve a vessel from liability for striking a bridge when the bridge failed to open and failed to give advance warning to the vessel or tug of its inability to open); *Monroe v. City of Chicago*, 194 F. 936, 939-40 (7th Cir. 1912) (same). As explained in *The Blue Jacket*, 144 U.S. 371, 392 (1892) an example of such an occurrence is "where one ship has, by wrong maneuvers, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong, and has not been maneuvered with perfect skill and presence of mind."

The party relying on the *in extremis* doctrine must be completely free from fault prior to the emergency occurrence. *Puerto Rico Ports Authority v. M/V Manhattan Prince*, 897 F.2d 1, 6 (1st Cir. 1990). "It does not excuse a vessel making a wrong maneuver in extremis where the imminence of the peril was occasioned by the fault or negligence of those in charge of the vessel, or might have been avoided by earlier precautions which it was bound to take." 70 Am. Jur. 2d Shipping § 619 (2003). Further, applicability of the doctrine does not prevent a finding of liability, it merely requires courts to judge a captain's reactions more leniently because of the crisis situation. *Grosse Ile Bridge Co. v. American Steamship Co.*, 302 F.3d 616, 625-26 (6th Cir. 2002).

Whether to rebut the presumption or argue for its inapplicability, defendants incorrectly attempt to avail them-

selves of the *in extremis* doctrine equating it to the "inevitable accident" doctrine. Based on the district court's findings, it is clear that the M/V Morgan was not operating *in extremis*. The dangerous situation was caused by a mechanical failure of the vessel itself; it was not placed in sudden peril by an outside force or party. *Cf. Grosse Ile Bridge Co.*, 302 F.3d at 625-26 (finding *in extremis* applicable where bridge failed to timely open but reasoning that captain's reaction to emergency situation was still negligent even under more lenient standard because his delay in dropping anchor to stop vessel's forward movement was unreasonable); *Puerto Rico Ports Authority*, 897 F.2d at 6-7 (applying *in extremis* doctrine to shield a tug from liability for striking a pier after it was forced to cast off its lines to avoid a collision with a tanker).

Moreover, the district court's finding that the vessel had sufficient time to respond properly to the failure of the starboard winch brake negates the applicability of this doctrine as it was not in "sudden peril" and had sufficient time to prevent the allision. *See* Richard J. Nikas, *Skimming the Surface: A Primer on the Law of Collision*, 9 U.S.F. Mar. L.J. 225, 240 (1996) ("Normally, the law of collision assumes there will be a reasonable opportunity for decision, however, this assumption is abandoned in cases of sudden peril."). Defendants attempt to merge the two doctrines of "inevitable accident" and *in extremis*, however, we find the *in extremis* doctrine inapplicable to accidents caused by mechanical failures.

### D. The district court properly apportioned fault equally between the parties.

Defendants attack the district court's finding that both parties were 50% liable as violative of (1) this court's cost avoidance doctrine as set forth in *Rodi Yachts, Inc.*, 984

F.2d at 886-87 and *Nat'l Gypsum Co.*, 915 F.2d at 1159 and (2) the rule of comparative fault in admiralty established by the Court in *Reliable Transfer*. Defendants' first argument takes a far too literal reading of *Rodi Yachts* and *National Gypsum*. In *National Gypsum*, we stated that "the doctrine of comparative fault is generally supposed to be used to assess liability in proportion to the cost of avoiding the entire accident to each side." 915 F.2d at1159. *A fortiori*, argue the defendants, because the City could have prevented the accident by placing a wooden fender in front of the recessed slot and the cost of such prevention is negligible, the City's should be held 100% liable for the damage to the bridge.

We find this analysis irreconcilable with the circumstances of the allision in this action. Taking the defendants' analysis to its logical conclusion, it would be absolved of liability (or at least significantly shielded) regardless of its actions or negligent reaction to a mechanical failure. Defendants acknowledge that the crew lost control of the vessel due to the failure of the starboard winch brake. They were in sole control of the maintenance and inspection of the winch—therefore the City cannot be held responsible for the M/V Morgan's failed machinery or the crew's unreasonable reaction to the equipment failure.

Defendants correctly assert that *National Gypsum* and *Rodi Yachts* involved ships which slipped their moorings and struck stationary objects. However, in *National Gypsum* the vessel was suing the City of Milwaukee arguing that it was negligently assigned to a slip containing hidden dangers, while in *Rodi Yachts* the issue was whether the defendant dock owner's chafed ropes or the defendant barge owner's improper mooring caused the vessel to come loose. The "fault" assessment, i.e., the maintenance of the slip dock or the upkeep/inspection of the ropes used to moor the vessel, involved an analysis of the

cost of preventing the vessels from drifting and causing the injuries.[17]

Here, by contrast, the comparative "fault" assessment is bifurcated between the affirmative actions of the M/V Morgan once the mechanical failure occurred and the City's contributory fault for failing to replace the fender system. The cost of avoiding the accident is relevant to the degree of contributory fault on the part of the plaintiff, however, this degree of fault is limited to foreseeable harms. Put another way, a plaintiff is not a soothsayer and is not responsible to prevent every possible harm. Rather, a plaintiff must undertake its own cost benefit analysis and choose between types and degrees of protective measures. *See Brotherhood Shipping Co., Ltd.*, 985 F.2d at 327 ("The cost-justified level of precaution . . . is thus higher, the likelier the accident that the precaution would have prevented was to occur . . . and the greater the loss that the accident was likely to inflict if it did occur.").  And that is exactly what occurred in this case. The City took some preventative measures by placing the cables outside of the navigable waterway in a recessed slot which would protect them from the more typical parallel rubbing or minor contact with the bridge's superstructure. However, the cables did remain exposed to river debris and foreign objects. The district court's decision to hold the City partially liable for the allision for failing to replace the wooden fender over the recessed slot which housed the cables was supported by the evidence. The court recognized that the cost of prevention was minimal and the potential harm to the bridge significant. The court also acknowledged that the allision could

---

[17] We explained in *Rodi Yachts* that "the sort of accident that happened here can be prevented, or at least the probability of its occurring can be greatly reduced, by regular inspection of the ropes to make sure that they are not chafing, or otherwise fraying, or loosening, or coming untied." 984 F.2d at 884.

have been prevented if the City had taken this further preventative measure. However, the district court also found the M/V Morgan crew's inability to face up the vessel caused an angular impact that was uncommon and unexpected. Thus, we find that the district court properly balanced the M/V Morgan's affirmative actions with the City's omissions and found both parties at fault.

We can quickly dispense with the defendants' second argument as we find that the district court did not clearly err in apportioning damages equally between the parties for the reasons stated above. *Nat'l Gypsum Co.*, 915 F.2d at 1159 (citing *McAllister*, 348 U.S. at 20 and finding clear error where the "district court apportioned liability based on the amount of property each side had at risk."); *Feeder Line Towing Serv. Inc. v. Toledo, Peoria & Western R.R. Co.*, 539 F.2d 1107, 1111 (7th Cir. 1976) (upholding district court's finding that defendant bridge was 65% liable based on its failure to light its protective system and that plaintiff was 35% liable based on the pilot's negligent angular alignment of vessel). Though an equal apportionment of fault is unusual, the *Reliable Transfer* Court explicitly held that if the parties are equally at fault, an equal apportionment is appropriate. 421 U.S. at 411. The district court found that both parties could have avoided the accident with more prudent behavior. Its decision to hold the City 50% liable for its omission reflects the court's recognition that the City could have prevented this accident cheaply, by simply replacing the wooden fender. This figure also acknowledges the M/V Morgan's liability in failing to face up the vessel. Therefore, we do not find that a "mistake" has been made in this apportionment, *Nat'l Gypsum Co.*, 915 F.2d at 1159, and affirm the district court's determination to apportion fault equally between the parties.

## III.  CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.


**A true Copy:**

      **Teste:**


          _____

          *Clerk of the United States Court of*
          *Appeals for the Seventh Circuit*