# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-2143

_____

Dakota, Minnesota & Eastern Railroad Corporation and Soo Line Railroad
Company d/b/a Canadian Pacific Railway

*Plaintiffs - Appellees*

v.

Ingram Barge Company

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Dubuque

_____

Submitted: January 17, 2019
Filed: March 21, 2019

_____

Before BENTON, MELLOY, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

The M/V Aubrey B. Harwell Jr. (the *Harwell*), a towboat operated by Ingram
Barge Company, was pushing empty barges up the Mississippi River when the barges
struck the Sabula Railroad Bridge, owned by Dakota, Minnesota & Eastern Railroad
Corporation (DM&E). DM&E sued Ingram for damages. Following a bench trial,

the district court entered judgment in favor of DM&E for the full amount sought.[1] Ingram appeals. Because we conclude that the district court committed an error of law, we vacate the judgment and remand for further proceedings.

I

The Secretary of War authorized the construction of the Sabula Railroad Bridge in 1880. To allow river traffic to pass, a portion of the Bridge rotates 90 degrees on a central pivot, producing two 154-foot-wide channels on either side. Protection piers extend north and south from the center of the Bridge; when the Bridge is in its open position, the Bridge's tracks rest above the piers separating the two channels. Northbound traffic ordinarily uses the east channel, and southbound traffic ordinarily uses the west channel. The typical barge arrangement on this portion of the river is approximately 105 feet wide, leaving under 25 feet of clearance on either side. Unsurprisingly, barge operators are sometimes unsuccessful at avoiding contact between their modern-sized tows and the centenarian Bridge. See generally I&M Rail Link, LLC v. Northstar Nav., Inc., 198 F.3d 1012 (7th Cir. 2000) (discussing a May 5, 1997, allision with the Bridge).

On June 17, 1996, the United States Coast Guard issued an Order to Alter pursuant to the Truman-Hobbs Act, 33 U.S.C. §§ 511 et seq. The Order to Alter declared the Bridge to be an "unreasonable obstruction to the free navigation of the Upper Mississippi River" and directed the then-owner to reconstruct the Bridge to expand the horizontal clearance to at least 300 feet, approximately double its current

---

[1]The complaint named Soo Line Railroad Company, DM&E's corporate parent, as an additional plaintiff and included a second claim relating to a September 7, 2015, allision involving a different bridge owned by Soo Line. That claim was dismissed pursuant to the parties' stipulation prior to trial and no allegations remain relevant to Soo Line.

width.  Neither DM&E nor any prior owner of the Bridge took any action to complete such reconstruction.

On April 24, 2015, the *Harwell* was traveling north on the Mississippi River. Hershey Dampier was steering under the supervision of pilot Tommy Hinton. Dampier was on his first trip as a licensed steersman but had traveled under the Bridge many times during his twelve years as a deckhand.  He discussed the procedure for passing through the Bridge with Hinton prior to their approach. Because the wind was blowing from east to west, Hinton advised Dampier to keep the barges pointed to the right side of the eastern channel.  About 300 or 400 feet from the Bridge, Dampier realized that the barges were too close to the protection pier on the left side.  Dampier attempted to correct by steering further to the east but the barges allided with the protection pier, causing damage to the wooden structure and a maintenance platform.  Dampier was not disciplined for the incident, and he has since piloted through the Bridge more than a dozen times without incident.  DM&E's staff concluded that the damage to the protection pier required immediate repair to prevent the risk that another allision would damage the tracks and render the Bridge inoperable.  Contractors completed the repairs at a cost of $276,860.85.  DM&E brought suit against Ingram to recover these repair costs.

Following a bench trial, the district court concluded that no comparative fault could attach to DM&E absent evidence of a breach of a legal duty to expand the Bridge's horizontal clearance, and that the Order to Alter imposed no such duty.  It apportioned all of the fault to Ingram and awarded DM&E the full amount of the repair costs plus prejudgment interest.

II

We review findings of a district court's bench trial in admiralty cases, including negligence determinations, under a clearly erroneous standard.  In re MO Barge

Lines, Inc., 360 F.3d 885, 889 (8th Cir. 2004). We will overturn a factual finding as clearly erroneous "only if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error was made." Urban Hotel Dev. Co. v. President Dev. Grp., L.C., 535 F.3d 874, 879 (8th Cir. 2008) (quoting Roemmich v. Eagle Eye Dev., LLC, 526 F.3d 343, 353 (8th Cir. 2008)). "In admiralty as in other contexts, however, we review purely legal determinations de novo." In re Am. Milling Co., 409 F.3d 1005, 1013 (8th Cir. 2005).

As in any negligence case, the plaintiff in a maritime allision suit bears the burden of proof by a preponderance of the evidence. Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 212 (2d Cir. 2009). The plaintiff must prove essentially the same elements as a land-based negligence claim at common law: that the defendant breached a legal duty, causing the injury sustained by the plaintiff. See In re Cooper/T. Smith, 929 F.2d 1073, 1077 (5th Cir. 1991) (per curiam); see also Evergreen Int'l, S.A. v. Norfolk Dredging Co., 531 F.3d 302, 308 (4th Cir. 2008). The duty of care owed by a moving vessel to a stationary object such as a bridge is reasonable care under the circumstances. Fischer v. S/Y NERAIDA, 508 F.3d 586, 593 (11th Cir. 2007). Experience and common sense counsel that a moving vessel does not ordinarily strike a stationary object unless the vessel is mishandled in some way. Am. Milling, 409 F.3d at 1018. As such, the plaintiff in an allision case may invoke the Oregon rule, which creates a rebuttable presumption that a moving vessel breached its duty of care when it allides with a stationary object. Id. at 1012; Union Pac. R.R. Co. v. Kirby Inland Marine, Inc. of Miss., 296 F.3d 671, 673 (8th Cir. 2002); see The Oregon, 158 U.S. 186, 197 (1895). The Oregon presumption satisfies the plaintiff's prima facie case, shifting the burden of proof on issues of duty and breach to the defendant. City of Chicago v. M/V Morgan, 375 F.3d 563, 572–73 (7th Cir. 2004).

To rebut the Oregon presumption, the moving vessel may prove one of three things: that "(1) the moving vessel used all reasonable care to avoid the [allision] and was therefore without fault, (2) the stationary object was at fault, or (3) the allision occurred because of an 'inevitable accident.'" Am. Milling, 409 F.3d at 1018 (quoting Bunge Corp. v. M/V Furness Bridge, 558 F.2d 790, 795 (5th Cir. 1977)). One method of proving that the stationary object was at fault is through the Pennsylvania rule. See The Pennsylvania, 86 U.S. 125, 136 (1873). Under the Pennsylvania rule, "if there is a violation of a statute or regulation designed to prevent collisions, the burden shifts to the violator to prove that the violation was not a contributing cause of the accident." Am. Milling, 409 F.3d at 1012. "For the *Pennsylvania* rule to apply, three elements must exist: (1) proof by a preponderance of the evidence of violation of a statute or regulation that imposes a *mandatory duty*; (2) the statute or regulation must involve *marine safety* or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent." Kirby Inland Marine, 296 F.3d at 674.

Ingram attempts to invoke the Pennsylvania rule by relying on the Coast Guard's 1996 Order to Alter. But in Kirby Inland Marine, we concluded that an Order to Alter issued by the Coast Guard cannot trigger the Pennsylvania rule because the Truman-Hobbs Act was not drafted to maintain marine safety, impose a specific duty, or prevent a particular sort of injury. 296 F.3d at 674. Instead, the Truman-Hobbs Act is a funding statute, and an Order to Alter is simply a mechanism the Coast Guard can use to make federal funding available for bridge reconstruction. Id. at 675. Although bridge alterations may reduce the number of allisions, "this is a collateral consequence and not a direct purpose of the Truman-Hobbs Act." Id. An Order to Alter based on the Coast Guard's finding that a bridge is an "unreasonable obstruction to navigation" is "not a direct comment on the safety of the bridge." Id. In short, a Truman-Hobbs Act finding does not satisfy the requirements of the Pennsylvania rule and therefore does not rebut the Oregon presumption. Id. at 676–78.

Although the Coast Guard's decision to issue an Order to Alter does not automatically rebut the Oregon presumption, it is still relevant to the analysis. The Order to Alter may be introduced as "another piece of evidence which the *trier of fact* may consider in determining fault in a negligence action." Id. at 677. That is, the vessel operator may still attempt to rebut the presumption through evidence of the stationary object's negligence—including the evidence relied upon by the Coast Guard in making its Truman-Hobbs Act finding. See id. at 678 (discussing other evidence of the bridge's obstructive character that may be used to rebut the Oregon presumption, including evidence documented by the Coast Guard in the Order to Alter); I&M Rail Link, 198 F.3d at 1016 ("If the Coast Guard may find the Sabula Bridge an unreasonable obstruction based on the cost and accident data, then so may the trier of fact in admiralty . . . .").

Relying on Kirby Inland Marine, the district court correctly concluded that the 1996 Order to Alter does not, as a matter of law, rebut the Oregon presumption through operation of the Pennsylvania rule. And it correctly admitted the Order to Alter and the supporting Truman-Hobbs Act reports into evidence. It analyzed the evidence supporting the Coast Guard's decision and concluded that it was insufficient to rebut the Oregon presumption. In other words, Ingram was unable to "exonerate itself from liability" because it could not prove that "the allision was the *sole* fault of the bridge." M/V Morgan, 375 F.3d at 574 (emphasis added).

But application of the Oregon rule does not end the analysis. The presumption "merely addresses a party's burden of proof and/or burden of persuasion; it is not a rule of ultimate liability." Id. at 572; accord Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp., 596 F.3d 357, 363 (6th Cir. 2010). Furthermore, it is properly limited to the issues of duty and breach; it does not resolve questions of causation or the percentages of fault assigned to the parties adjudged negligent. Combo Mar., Inc. v. U.S. United Bulk Terminal, LLC, 615 F.3d 599, 605 (5th Cir. 2010). Under maritime law, liability for an allision is apportioned based upon the

comparative fault of the parties.  Evergreen Int'l, 531 F.3d at 308; see also United States v. Reliable Transfer Co., 421 U.S. 397, 411 (1975).  In a comparative fault regime, "[t]he plaintiff's negligence reduces the amount of damages that he can collect, but is not a defense to liability."  Bhd. Shipping Co. v. St. Paul Fire & Marine Ins. Co., 985 F.2d 323, 325 (7th Cir. 1993).  "Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm."  Restatement (Second) of Torts § 463 (Am. Law Inst. 1965).  If the owner of a bridge fails to adhere to the standard of "a reasonable person under like circumstances," and this failure contributes to an allision, the court may reduce the owner's recovery accordingly.  S. C. Loveland, Inc. v. E. W. Towing, Inc., 608 F.2d 160, 166 (5th Cir. 1979).

In its comparative fault analysis, the district court concluded that DM&E could not be assigned any share of fault because it had no legal duty to remove or alter the lawfully permitted Bridge.  But the owner of a lawful bridge may be found comparatively negligent for an allision even absent an affirmative legal duty to alter the bridge's configuration, as illustrated by the Seventh Circuit's decision in M/V Morgan.  In that case, the court examined an allision between a tugboat and a bridge that resulted in damage to the bridge's electrical cabling.  375 F.3d at 570.  The court concluded that the tugboat operators had failed to rebut the Oregon presumption and were liable for negligence.  Id. at 573–78.  Nonetheless, and even though the bridge was in compliance with its permit, the court affirmed the district court's equal apportionment of damages between the parties based on the bridge owner's failure to replace a wooden fender that previously protected the cabling.  Id. at 578–79.  It follows from M/V Morgan that a negligent bridge owner may face reduced damages from an allision under admiralty's comparative fault regime, as the Seventh Circuit has held in a previous case dealing with an allision with the Sabula Bridge.  See I&M Rail Link, 198 F.3d at 1016 (remanding to the district court to determine whether the

-7-

Bridge's design "bear[s] some responsibility" for allision). It also follows that a finding of comparative negligence does not necessarily require the bridge owner to have violated a specific legal duty owed to others imposed by statute or regulation. All that is required is a finding that the bridge owner was negligent and that this "negligence . . . contribute[d] to the loss." 1 Admiralty & Mar. Law § 5:7 (6th ed. 2018).

DM&E argues that California v. Sierra Club, 451 U.S. 287 (1981), stands for the proposition that a lawfully permitted bridge's obstruction to navigation cannot constitute negligence. We disagree. Sierra Club simply concluded that Section 10 of the Rivers and Harbors Appropriation Act, which prohibits the creation of any obstruction to navigable waters not authorized by Congress, did not establish a private right of action. See id. at 292–97. This holding does not immunize a bridge from its own comparative fault when an allision occurs. Since Sierra Club, we have held that "the trier of fact should determine whether" a lawful bridge's obstruction to navigation is unreasonable and a contributing cause of an allision, Kirby Inland Marine, 296 F.3d at 676, as has the Seventh Circuit specifically with regard to the Sabula Bridge, I&M Rail Link, 198 F.3d at 1016. If the district court so concludes, it may reduce the bridge owner's recovery based upon the bridge's comparative fault.

DM&E also argues that the district court independently found that the *Harwell*'s crew's negligence was the only "actual cause" of the allision, and that this factual finding was not clearly erroneous. We are dubious that this truly was an independent factual finding. The district court's conclusion that Ingram was solely responsible for the accident came only after it concluded that it could not, as a matter of law, apportion any of the fault to DM&E. And the court acknowledged that the evidence demonstrated that the Bridge "poses a difficult obstacle to barge traffic" due to the narrowness of its channels, which leave "little clearance" for modern barge configurations. It appears that the district court's factual finding apportioning all of

the fault to Ingram may not have been divorced from its earlier legal error.[2] A factual finding "based on an erroneous view of the law" will not be upheld, even on review for clear error.  <u>Urban Hotel</u>, 535 F.3d at 879.  We express no opinion on whether DM&E in fact was comparatively negligent; we leave that assessment to the district court in the first instance.

In accordance with the above, we vacate the decision of the district court and remand for further proceedings consistent with this opinion.

———————————————

[2]DM&E places great weight on the district court's use of the word "[m]oreover" to separate its legal conclusion that it could not apportion fault to DM&E from its factual finding that Ingram's negligence was the sole cause of the allision.  We do not parse the language of the district court's opinion with such granularity.  <u>See</u> <u>Reiter v. Sonotone Corp.</u>, 442 U.S. 330, 341 (1979).  Read in context, the district court's later factual finding may have resulted from its earlier legal analysis.